[Sac. No. 7976. In Bank. Mar. 19, 1974.]

THEODORE A. D'AMICO et al., Plaintiffs and Appellants, v.
BOARD OF MEDICAL EXAMINERS et al., Defendants and Appellants;
BOARD OF OSTEOPATHIC EXAMINERS et al.,
Defendants and Respondents.

**COUNSEL**

Alexander E. Tobin and Tobin & Gassner for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, Talmadge R. Jones and Joel E. Carey, Deputy Attorneys General, for Defendants and Appellants.

Hassard, Bonnington, Rogers & Huber, Howard Hassard and John I. Jefsen as Amici Curiae on behalf of Defendants and Appellants.

Clarence S. Brown for Defendants and Respondents.

## OPINION

**SULLIVAN, J.**—The state Board of Medical Examiners (medical board) and its president appeal from a summary judgment granting a peremptory writ of mandate ordering the state Board of Osteopathic Examiners (osteopathic board) to furnish plaintiff osteopaths and all others of their class with application forms, to process those forms as received, and to examine and license as physicians and surgeons plaintiffs and all others of their class as are found qualified under the provisions of the Osteopathic Act and the Medical Practice Act.

This litigation constitutes the latest chapter in the long and bitter history of the efforts of medical practitioners having osteopathic (as opposed to allopathic) training to practice their profession in this state. That history has been amply described in previous appellate opinions and we do not undertake to reiterate it here. (See *D'Amico* v. *Board of Medical Examiners* (1970) 6 Cal.App.3d 716, 721-723 [86 Cal.Rptr. 245]; *Osteopathic Physicians & Surgeons* v. *Cal. Medical Assn.* (1964) 224 Cal.App.2d 378 [36 Cal.Rptr. 641]; *Gamble* v. *Bd. of Osteopathic Examiners* (1942) 21 Cal. 2d 215 [130 P.2d 382].) Instead we turn directly to a consideration of the instant litigation.

Plaintiffs are eight graduates of out-of-state colleges of osteopathy and hold D.O. degrees granted by those colleges. Four are residents of California and all have either been admitted to practice in other states or are practicing on federal enclaves in this state as members of the armed forces. All plaintiffs desire to practice their profession as physicians and surgeons in California but are not permitted to do so by present law. Their basic claim is that the law which so prevents their consideration for licensure (to wit, the Osteopathic Act of 1962 (1962 Act),[1] together with the 1962 amendment to the Medical Practice Act in section 2310 of the Business and Professions Code) denies them equal protection of the laws in violation of the state and federal Constitutions.

The instant action was commenced in 1968. In their first amended petition plaintiffs prayed, generally speaking, that defendant boards be com-

---

[1]The Osteopathic Act of 1962 was a referendum measure amending the Osteopathic Act of 1922, which was enacted by initiative. (Stats. 1963, First Ex. Sess. 1962, ch. 48, pp. 337-338, 4 Deering's Ann. Bus. & Prof. Code (1960 ed.) Appendix I to 1961-1973 Cum. Supp., pp. 281-286, 3 West's Ann. Bus. & Prof. Code (1962 ed.) Cum. Pocket Part, pp. 273-276; Stats. 1923, p. xciv, 4 Deering's Ann. Bus. & Prof. Code (1960 ed.) appendix p. 523, 3 West's Ann. Bus. & Prof. Code (1962 ed.) p. 550.)

pelled to examine and license them as physicians and surgeons—*either* in the manner provided for the examination and licensing of "new" physicians *or* in the manner provided, as a matter of reciprocity, for the examination and licensing of out-of-state physicians.[2]

Defendants appeared by separate demurrers. The demurrer of the osteopathic board was sustained without leave to amend. The demurrer of the medical board was sustained without leave to amend as to those counts dealing with reciprocity but was overruled as to those counts dealing with "new" licensing. Leave to answer was denied to defendants and judgment was entered ordering that a peremptory writ of mandate issue directing the *medical board* "to furnish application forms to each of the petitioners and to process said applications in accordance with provisions of the California Medical Practice Act." However, for reasons which appear below, plaintiffs greeted this "victory" with less than elation, and they appealed.

Plaintiffs' unwillingness to accept the trial court's decision on demurrer, and their subsequent appeal, are best understood through a brief consideration of the two scholarly memorandum opinions filed by that court.

The first question before the court was whether "present law"—which is the referendum Osteopathic Act of 1962, amending and repealing certain portions of the initiative measure entitled the Osteopathic Act of 1922—gave either of defendant boards authority to examine and license plaintiffs as "new" physicians. Apparently the Attorney General and various state administrative officers had taken the position *prior* to this litigation that such authority *no longer resided in either board,* and plaintiffs sought to raise an equal protection argument on this basis. However, an amicus curiae brief filed in the trial court by the California Medical Association (C.M.A.) took the opposite position—possibly in order to avoid plaintiffs' equal protection argument. The C.M.A.'s position was that under the 1962 Act the medical board *did* have the power to examine and license osteopaths as physicians and surgeons. This "concession" would seem to be illusory, since the medical board has no procedures for inspecting osteopathic schools and certifies only those schools certified by the American Medical Association (A.M.A.), which presently does not certify osteopathic schools.

Perceiving the advantage to be gained by acceptance of the C.M.A.'s position—namely, the possible avoidance of plaintiffs' equal protection argument—the medical board through the Attorney General changed its

[2]Apparently the "reciprocity" examination is less rigorous than that given previously unlicensed physicians.

former position in the midst of the litigation. To evidence its conversion it offered eight blank application forms to plaintiffs and then proceeded to announce that the matter was moot.

The trial court on demurrer was not deluded by the argument of mootness—noting that it was the object of plaintiffs to be licensed by the *osteopathic* board, which had procedures for approving their schools. However, it accepted the position of the C.M.A. and the medical board on its merits. Reviewing the pitched battle that has raged between the osteopathic and allopathic professions since the turn of the century—and the various legislative acts which have littered the field—the trial court concluded that the 1962 referendum act, by removing from the osteopathic board the power to license osteopaths, had revived a portion of a 1913 act which had placed the power to license osteopaths in the medical board. As to the question of medical board inability or refusal to approve osteopathic schools, the court considered that such matter would best be considered in a later proceeding when it was actually shown that the medical board, although having the power to license osteopaths as physicians, did not do so because it could not or would not approve osteopathic schools.[3]

In a supplemental opinion the trial court on demurrer considered the question of *reciprocity* examination and licensing. Here the constitutional question was unavoidable, for the Business and Professions Code (§ 2310, as amended in 1962) expressly provides that only those holding an M.D. degree are eligible for a reciprocity certificate. The question was determined by means of judicial notice. Referring almost exclusively to a work written by an M.D. and *published after* the passage of the 1962 referendum, the court concluded that the differences in the quality of osteopathic education provided a conceivable state of facts which might reasonably justify the legislative conclusion that osteopaths seeking licensure as physicians take the comprehensive examination required of "new" physicians. Thus the court held that there was no denial of equal protection in forbidding reciprocity licenses to osteopaths.

Plaintiffs appealed. The Court of Appeal in *D'Amico* v. *Board of Medical Examiners, supra,* 6 Cal.App.3d 716, reached a result more pleasing to them. Again reviewing the history of internecine conflict between the osteopathic and allopathic schools of medicine in California, the court concluded that the 1962 referendum act indeed had the effect of removing from both the osteopathic board and the medical board authority to ex-

---

[3]Section 2174 of the Business and Professions Code provides for a statutory action to compel the medical board to approve a school disapproved by it.

amine and license as physicians and surgeons persons who had received their degree from an osteopathic school. Among the considerations which led it to this conclusion were (1) the fact that a 1961 agreement between the C.M.A. and the California Osteopathic Association[4] contemplated that the subject legislation, which the parties agreed to support, would eliminate the future licensing of osteopaths as physicians in California while providing for the licensure *as M.D.'s* of graduates from the single osteopathic school in California; (2) the Attorney General's interpretation of the 1962 Act over a period of six years to the effect that it forbade licensure of osteopaths; (3) the similar interpretation of the medical board over that period of time; (4) the fact that no osteopaths had been examined or licensed as physicians and surgeons since 1962; (5) the fact that no osteopathic school had been approved by the medical board since 1962; (6) the fact that no holder of an osteopathic degree was eligible for appointment to the medical board; and (7) the fact that the ballot argument in favor of the 1962 Act represented that adoption thereof would discontinue the practice of osteopathy in California. The court concluded: "[T]he terms of the act, its effect if given the interpretation now urged by defendants, the administrative interpretations given it, the intent of the merger agreement in which it was agreed that the parties thereto would support the initiative or legislation bringing about the complete elimination of new osteopaths, and the interpretation of the act by the Legislature as shown by the statutes adopted in view of the passage of the act, all compel the conclusion that the elimination of the licensure of new osteopaths is the only reasonable result." (6 Cal.App.3d at p. 726.)

This conclusion placed squarely before the Court of Appeal the fundamental constitutional question which plaintiffs sought to raise. However, the court held, that question was not of a nature to be determined by appellate judicial notice. "Insofar as the question of the constitutionality of the 1962 Osteopathic Act is concerned, the question of whether there are facts which would justify a different classification of graduates from medical schools from those from osteopathic schools is one which, under the pleadings in this case, should be decided in the first instance by the superior court; and that court not having determined that question, the case will have to be remanded for that determination. This question should not be determined on demurrer but by a trial. (*D'Amico* v. *Board of Medical Examiners, supra,* at pp. 727-728.) Accordingly, the Court of Appeal reversed the order sustaining the demurrer of the osteopathic board, affirmed the order overruling the demurrer of the medical board, reversed

---

[4]The agreement is described and quoted in *Osteopathic Physicians & Surgeons* v. *Cal. Medical Assn., supra,* 224 Cal.App.2d 378, 389-395, footnote 2.

the judgment in all other respects, and remanded the cause to the trial court with instructions to permit defendants to answer "and the cause then to be tried in accordance with the views herein expressed." (*Id.* at p. 728.)

A petition for hearing was denied by this court on June 17, 1970.

At this point a second round of trial court activity began. Soon after the medical board had filed its answer to the petition for mandate, plaintiffs served an extensive set of interrogatories and requests for admissions on the board directed to determining what facts, if any, might justify the distinction made between allopaths and osteopaths in the 1962 enactments. The medical board, through the Attorney General,[5] proceeded to assume a position which might be best described as a failure to accept the major premise underlying the discovery effort. Unfortunately, that major premise was also the law of the case, to wit, that the 1962 Act forbids the issuance of "new" physicians and surgeons licenses to osteopaths.[6] Accordingly, during the ensuing nine months the trial court was required to grant at least three motions to compel further answers. On April 22, 1971, the final motion of this variety was granted. Although refusing to grant summary judgment as a sanction for the medical board's failure to supply discovery, the court in its order noted that the response filed by the board in its third supplemental answers "show[ed] a lack of an understanding of the spirit of the discovery rules and procedure or a deliberate attempt to avoid the obligation to answer." A monetary sanction of $750 was assessed against the medical board and its counsel the Attorney General, and the board was again ordered to answer.

On May 3, 1971, in response to the foregoing order, the board filed its final answers. Included among these were the following: "*84.* Respondent

---

[5]The Attorney General is statutory counsel for the medical board as well as for the osteopathic board. (Gov. Code, §§ 12511, 12512.) Early in these proceedings, however, the Attorney General determined that there was a possible conflict between the medical and osteopathic boards, and the latter board retained private counsel.

[6]The Attorney General continues to argue before this court that the opinion of the Court of Appeal established only that the 1962 Act forbade the issuance of licenses to practice osteopathy and did not go so far as to establish as the law of the case that the act prevented the issuance of physicians and surgeons licenses to those with osteopathic training. We consider this argument disingenuous. Although under the Medical Practice Act of 1907 the medical board was authorized to issue licenses to practice osteopathy, since 1913 no such license has been authorized. The opinion of the Court of Appeal is pellucid in its holding that the 1962 Osteopathic Act effectively precludes physicians with osteopathic training from obtaining the only authorized license which will permit them to practice their profession in California, to wit, a physicians and surgeons license.

admits that in recent years, the practice of osteopathy has evolved into a complete school of medicine and surgery and that, in those jurisdictions which give full practicing powers to osteopathic physicians and surgeons, said physicians and surgeons generally integrate all accepted methods of treatment of disease and injury including manipulation, drugs, operative surgery and physical therapy as dictated by diagnosis of individual patients. [¶] *86.* Respondent admits that in recent years osteopathy has developed into a full school of medicine engaging in all the activities commonly thought of as constituting medical science. . . . [¶] *117.* Respondent admits that the People of the State of California can be protected by proper screening of all applicants for licensure as physicians and surgeons and believes that the laws now provide for such screening of all such applicants."[7]

Upon receiving these answers plaintiffs moved for summary judgment on the merits, which motion was granted.[8] The judgment subsequently entered declared (1) that declaratory relief was proper in the circumstances; (2) that the Osteopathic Act of 1962, without regard to individual qualifications, bars plaintiffs and all other graduates of osteopathic schools who were not licensed at the time of its enactment from general licensure as physicians and surgeons; (3) that the Medical Practice Act as amended

---

[7]Other undisputed facts before the trial court on the motion included the following: (1) That California is the only state in the country which bars osteopaths from practice. (2) That osteopaths currently engage in full medical practice in California on federal enclaves. (3) That members of the osteopathic profession participate in a full range of medical specialties, including neurosurgery and psychiatry. (4) That the A.M.A. considers osteopathic background and education the equivalent of allopathic background and education for purposes of membership on its specialty boards.

[8]A previous motion on the merits, made before the final admissions were obtained, had been denied by the trial court with the observation that plaintiffs, for the purpose of the motion had "assumed the burden of proving a negative" and had not met that burden. The trial court upon granting the second motion, filed the following opinion: "This is the second motion for summary judgment, the last one was denied because the Appellate Court in its decision directed the lower court to take evidence in order to determine whether the graduates of medical allopathic schools were superior to those graduating from osteopathic schools, this was to be a factual determination. However, since the decision on the former motion the State has been required by Court order to answer certain requests for admissions and these admissions now demonstrate that there are no longer any material factual contentions, see admissions 56, 84, 86 and 117, and that the State is unable to meet the burden imposed upon it to justify that the distinctions are necessary to accomplish a compelling interest to further its purpose. Westbrook v. Mihaly, 2 Cal. (3rd) 765. [¶] I was somewhat hesitant to grant this motion until I read Sail'er Inn, Inc. v. Kirby, 5 Cal. (3rd) 1, but that case seems to be to put to rest the contention that the State under the decision of this case by Judge Bray 6 C.A. (3rd) 716 has the burden and duty to show justification for the classification and this the State admits it cannot do. [¶] The Motion for Summary Judgment is Granted."

in 1962 (Bus. & Prof. Code, § 2310), without regard to individual qualifications, bars plaintiffs and all other graduates of osteopathic schools who were not licensed at the time of its enactment from reciprocity licensure as physicians and surgeons; (4) "That a principal inducement for the subject enactments was the barring from licensure of all future graduates of schools of osteopathic medicine, along with the continued licensure of future qualified graduates of allopathic schools of medicine and the continued licensure of previously licensed graduates of osteopathic schools of medicine[;] [n]o justification for such discrimination against [plaintiffs] and their class appearing, that discrimination is here declared to be invidious and unlawful under the equal protection provisions of the Fourteenth Amendment, of the United States Constitution, and under Articles I, XI, and XXI of the California Constitution[;] [t]herefore said amending and repealing enactments (Stats. 1962, 1st Ex. Sess., c. 46 and c. 48 [i.e., the Osteopathic Act of 1962 and the 1962 amendment to the Medical Practice Act in section 2310 of the Business and Professions Code]) are here declared null, void, and of no effect"; (5) that the medical board has no powers with respect to the licensure of osteopaths; and (6) that the osteopathic board has all relevant powers and duties with respect to the licensure of plaintiffs and all other graduates of osteopathic schools as physicians and surgeons in accordance with the terms of the Osteopathic and Medical Practice Acts.[9] Accordingly the court ordered the issuance of a peremptory writ of mandate commanding the osteopathic board to furnish, receive, and process application forms and to examine and license plaintiffs and all others of their class as might be found qualified under the said acts. This appeal followed.[10]

## I

We meet at the outset two interrelated contentions concerning the basic propriety of summary judgment procedures in the circumstances of this case.

---

[9]The power to license osteopaths resided in the osteopathic board prior to the 1962 enactment.

[10]Only the medical board and its president, represented by the Attorney General, appeal from the judgment. The osteopathic board and its president, represented by private counsel (see fn. 5, *ante*), are nominal defendants, but they early became dismayed by the tactics of the medical board and its counsel following the first appeal, and since the first motion for summary judgment (see fn. 8, *ante*) they have become reluctantly aligned with plaintiffs in seeking summary judgment; they have not appealed. Counsel for the C.M.A. have filed a brief amicus curiae supporting the contentions of the medical board.

Plaintiffs have filed a cross-appeal objecting to a portion of the judgment denying them an award of attorney's fees.

■ The first relates specifically to whether or not the order made on the first appeal has been complied with by the trial court; because the decision on the first appeal ordered that the basic equal protection issue be "tried in accordance with the views herein expressed," it is urged that any resolution short of a full trial on the merits is inconsistent with that order.

■ The second contention is more general and relates to fundamental questions of judicial policy and separation of powers. This contention (or group of contentions) is, as we understand it, comprised of the following propositions. (1) When a challenge to a legislative act involves a determination of "constitutional fact," that determination cannot be made on the basis of concessions by a party to the action, for to do so would be to relegate the public interest to the mercy of litigation tactics. (2) The fact that the Attorney General, the chief law officer of the state concerned with the protection of the public interest, represents the party making such concessions does not alter the fact that the public interest remains unrepresented, for there remains the possibility of conflict between the interest of the represented party and the public interest. (3) Such a determination, in view of the extraordinary power thereby exercised over a coordinate branch of government (i.e., the legislative branch), must be made on the basis of judicial findings on evidence produced before the court by witnesses subject to cross-examination and the other safeguards attendant upon full trial proceedings. (4) In the course of such a proceeding the court itself bears the responsibility of insuring that there are exposed for its consideration the full historic facts underlying the enactment under attack in order that it may properly determine whether there exists a rational basis for the legislative choice.

■ Turning to the first contention, we find nothing in the opinion or order rendered on the first appeal (*D'Amico* v. *Board of Medical Examiners, supra,* 6 Cal.App.3d 716) which would indicate that the trial court upon remand was to be foreclosed from entertaining and deciding motions designed to eliminate from the proceedings issues not subject to factual dispute. It must be remembered that the Court of Appeal, having determined that the equal protection issue was not to be avoided by a ruling on demurrer to the effect that the 1962 enactments did not prevent new licensure of osteopaths, was then asked to address that fundamental issue on the basis of the limited materials before it on demurrer together with the fruits of judicial notice. This it properly declined to do. Observing that the trial court had not hesitated to undertake the task on that basis with respect to the subsidiary matter of reciprocity licensure, the Court of Appeal held that, in view of the necessity under Evidence Code section

455 for the parties to have an opportunity to dispute matters to be judicially noticed, a "full scale hearing" on the trial level was the preferable mode of proceeding. However, we do not believe that this indicated an intention to foreclose the trial court at that hearing from permitting the use of established procedures to eliminate issues concerning which there was no factual dispute among the parties. To read the opinion otherwise would be to attribute to the Court of Appeal an intention to enjoin upon the trial court the conduct of proceedings which, in light of ultimate developments before the latter court, smacked of futility. We refuse to draw that extreme conclusion in the absence of more specific language.

 We thus turn to the second contention or group of contentions, which we summarize for the sake of brevity as follows: That even in the absence of an appellate directive to refrain from summary judgment procedures in the trial of this case, such procedures are inherently inapposite to a proceeding of this nature because they expose to the vagaries of litigation tactics questions of "constitutional fact" whose intimate relation to the public interest, along with proper respect for the legislative branch of government, require that they be determined by the court itself on the basis of actual evidence produced before it.

Granting the necessity to insure that questions imbued with the public interest not be decided by means of procedures ill-calculated to provide adequate representation of that interest,[11] we are nevertheless of the view that in the circumstances of this case such representation has been amply provided and that therefore no good purpose would be served by foreclosing the parties from using all procedures normally available to them.

 The Attorney General, who has represented the medical board at all stages of this proceeding as well as during all prior proceedings relating to the subject matter (see fn. 5, *ante*), is the chief law officer of the state (Cal. Const., art. V, § 13). As such he possesses not only extensive statutory powers but also broad powers derived from the common law relative to the protection of the public interest. (See *Pierce* v. *Superior Court* (1934) 1 Cal.2d 759, 761-762 [37 P.2d 460, 96 A.L.R. 1020], and cases there cited, especially *People* v. *Stratton* (1864) 25 Cal. 242, 246-247.) "[H]e represents the interest of the people in a matter of public concern." (*Savings Bank* v. *Superior Court* (1894) 103 Cal. 27, 32 [36 P. 1015].) Thus, "in the absence of any legislative restriction, [he] has the power to file any civil action or proceeding directly involving the rights and interests of the state, or which he deems necessary for the enforcement of the laws of the

---

[11]See Scharpf, *Judicial Review and the Political Question: A Functional Analysis* (1966) 75 Yale L.J. 517, 524-529.

state, the preservation of order, and the protection of public rights and interest." (*Pierce* v. *Superior Court, supra,* at pp. 761-762.) Conversely, he has the duty to defend all cases in which the state or one of its officers is a party. (Gov. Code, § 12512.) ▉ In the course of discharging this duty he is often called upon to make legal determinations both in his capacity as a representative of the public interest and as statutory counsel for the state or one of its agencies or officers. In the great majority of such cases no conflict will result because in representing the interest of his "client" the Attorney General will take a position consistent with what he deems to be in the public interest. In the exceptional case the Attorney General, recognizing that his paramount duty to represent the public interest cannot be discharged without conflict, may consent to the employment of special counsel by a state agency or officer. (See Gov. Code, § 11040.) However, unless the Attorney General asserts the existence of such a conflict, it must be concluded that the actions and determinations of the Attorney General in such a lawsuit are made *both* as a representative of the public interest *and* as counsel for the state agency or officer.

▉ It does not trouble us that the determinations made by the Attorney General in this case led to certain concessions on his part relative to so-called "constitutional facts."[12] Such a result, if not common, is nevertheless clearly within the scope of the Attorney General's dual role as representative of a state agency and guardian of the public interest. In the recent case of *Tip Top Foods, Inc.* v. *Lyng* (1972) 28 Cal.App.3d 533 [104 Cal.Rptr. 718], for example, a manufacturer of "products resembling milk products" brought an action against the state Director of Agriculture and other officials in the Department of Agriculture seeking to restrain enforcement of certain sections of the Agricultural Code claimed by plaintiffs to be unconstitutional. Among these sections was one providing in substance that no "products resembling milk products"[13] should be used in charitable or penal institutions receiving state assistance unless milk products were unavailable. The Court of Appeal agreed with the trial court's conclusion that the statute was an invalid exercise of the police power because it bore no rational relationship to a permissible legislative objective. In determining that the statute had no rational relationship to public health the court relied without further inquiry upon the concession of defendants, acting through the Attorney General, that the subject prod-

---

[12]When the constitutionality of an enactment depends upon the presence of certain facts, those facts are known as "constitutional facts." (See generally, Dickenson, *Crowell* v. *Benson: Judicial Review of Administrative Determinations of Questions of "Constitutional Fact"* (1932) 80 U.Pa.L.Rev. 1055; Jaffee, *Judicial Review: Constitutional and Jurisdictional Fact* (1957) 70 Harv.L.Rev. 953.)

[13]The quoted designation is a term of art having a specific statutory definition.

ucts " 'are sufficiently nutritious to be sold on the open market.' " (28 Cal. App.3d at p. 542.) Clearly, in making this concession relative to a "constitutional fact" the Attorney General was acting both as counsel for defendants and as the representative of the public interest. It is equally clear that the court was correct in accepting this concession rather than insisting in spite of it that the nutritive qualities of the subject products be proved by specific evidence.

By the same token we conclude that in the circumstances of this case the Attorney General had the power to make binding concessions of "constitutional facts" bearing upon the validity of the 1962 enactments under the equal protection clause. In the absence of any declaration by the Attorney General that there was some conflict between his duty as counsel to his "client" agency and his paramount duty to represent and protect the public interest, we must conclude that any concessions made by that officer were made in his dual capacity and with knowledge of the true facts. Accordingly we find no considerations of judicial policy or separation of powers which would prevent the acceptance of those concessions at full value by the trial court.

■ For all of the foregoing reasons we hold that the trial court was not in error when it *entertained* plaintiff's motion for summary judgment in this case. It remains to be determined whether that motion was properly *granted*.

## II

We inquire at the outset whether the trial court employed the proper test in reviewing the legislative classification in question under the equal protection clause. ■ There are two such tests which are applied by the courts of this state and the United States Supreme Court. The first is the basic and conventional standard for reviewing economic and social welfare legislation in which there is a "discrimination" or differentiation of treatment between classes or individuals. It manifests restraint by the judiciary in relation to the discretionary act of a co-equal branch of government; in so doing it invests legislation involving such differentiated treatment with a presumption of constitutionality and "requir[es] merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose." (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784 [87 Cal.Rptr. 839, 471 P.2d 487].) "So long as such a classification 'does not permit one to exercise the privilege while refusing it to another of like qualifications, under like conditions and circumstances, it is unobjectionable upon this ground.' (*Watson* v. *Division of Motor Vehicles* (1931) 212 Cal. 279, 284 [298 P. 481]; see also *Blu-*

*menthal* v. *Board of Medical Examiners, supra,* 57 Cal.2d 228, 233.)" (*Whittaker* v. *Superior Court* (1968) 68 Cal.2d 357, 367-368 [66 Cal. Rptr. 710, 438 P.2d 358].) Moreover, the burden of demonstrating the invalidity of a classification under this standard rests squarely upon *the party who assails it.* (*Lindsley* v. *Natural Carbonic Gas Co.* (1911) 220 U.S. 61, 78-79 [55 L.Ed. 369, 377-378, 31 S.Ct. 337]; *Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 233 [18 Cal.Rptr. 501, 368 P.2d 101]; see also *Developments in the Law—Equal Protection* (1969) 82 Harv.L.Rev. 1065, 1077-1087.)

A more stringent test is applied, however, in cases involving "suspect classifications" or touching on "fundamental interests." Here the courts adopt "an attitude of active and critical analysis, subjecting the classification to strict scrutiny. (See *Shapiro* v. *Thompson, supra,* 394 U.S. 618, 638 [22 L.Ed.2d 600, 617, 89 S.Ct. 1322]; *Sherbert* v. *Verner* (1963) 374 U.S. 398, 406 [10 L.Ed.2d 965, 971-972, 83 S.Ct. 1790]; *Skinner* v. *Oklahoma, supra,* 316 U.S. 535, 541 [86 L.Ed. 1655, 1660, 62 S.Ct. 1110]; see also *Developments in the Law—Equal Protection* (1969) 82 Harv.L.Rev. 1065, 1120-1131 [1087-1131].) Under the strict standard applied in such cases, *the state* bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose." (*Westbrook* v. *Mihaly, supra,* 2 Cal.3d at pp. 784-785.) (Some italics added.)

The conventional "rational relationship" test is traditionally applied in cases involving occupational licensing, including those concerning the practice of the healing arts. (See *Williamson* v. *Lee Optical Co.* (1955) 348 U.S. 483, 488-489 [99 L.Ed. 563, 572-573, 75 S.Ct. 461]; *Blumenthal* v. *Board of Medical Examiners, supra,* 57 Cal.2d 228, 232-233; *Magan Medical Clinic* v. *Cal. State Bd. of Medical Examiners* (1967) 249 Cal. App.2d 124, 131-132 [57 Cal.Rptr. 256].) Nevertheless, in certain cases involving occupational regulation the more stringent "strict scrutiny" test has been employed. (See, e.g., *In re Griffiths* (1973) 413 U.S. 717, 718-722 [37 L.Ed.2d 910, 913-916, 93 S.Ct. 2851]; *Raffaelli* v. *Committee of Bar Examiners* (1972) 7 Cal.3d 288, 291-294 [10 Cal.Rptr. 896, 496 P.2d 1264, 53 A.L.R.3d 1149]; *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 16-20 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]; *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 579-580 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].) Those cases, however, have invariably involved a classification drawn along lines which rendered it "suspect" in constitutional terms—such as national origin or alienage (*Griffiths, Raffaelli,* and *Purdy & Fitzpatrick*) or sex (*Sail'er Inn*). In the instant case, on the other hand, the statutory classification is based upon

the type of medical degree possessed by those who would be licensed as physicians and surgeons—which in turn depends upon the type and content of education manifested by the conferral of such degrees. Nor can it be said that the instant case touches upon "fundamental interests" as that term has lately been defined by the United States Supreme Court, for the right to be admitted to a certain profession is not a right "explicitly or implicitly guaranteed by the Constitution." (*San Antonio School District v. Rodriguez* (1973) 411 U.S. 1, 33-34 [36 L.Ed.2d 16, 43, 93 S.Ct. 1278].)

Plaintiffs rely heavily on the decision of this court in *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1. It is true that in that case we employed rather broad language in describing why the "strict scrutiny" standard was applicable—including language which might be fairly read to indicate that the statute in question touched upon a "fundamental interest" within the meaning of the above-discussed cases insofar as it limited the right of a class of persons to pursue a lawful profession. We do not believe, however, that that language compels the application of the more stringent standard of review to this case. Three independent reasons support our belief. First, the fundamental thrust of *Sail'er Inn* is against discrimination on the basis of sex, a classification which is clearly "suspect" and therefore subject on that basis to review under the "strict scrutiny" test. Second, to the extent that *Sail'er Inn* may be interpreted to find a cognizable "fundamental interest" in the right to pursue employment, it is clearly limited in scope to "the common occupations of the community" and should not be applied to professions whose technical complexity and intimate relationship to the public interest and welfare counsel greater deference to the legislative judgment. Third, and perhaps most significant from the point of view of legal precedent, *Sail'er Inn* was decided prior to the case of *San Antonio School District* v. *Rodriguez, supra,* 411 U.S. 1; the latter case, as we have indicated above, establishes that "fundamental interests" for the purpose of equal protection review are limited to rights which are "explicitly or implicitly guaranteed by the Constitution." (411 U.S. at pp. 33-34 [36 L.Ed.2d at pp. 43-44].) No such interest or right is involved in the instant case.

█ We have therefore concluded that the trial court, in ruling upon plaintiffs' second motion for a summary judgment, employed the wrong equal protection standard when, relying upon our *Sail'er Inn* decision, it applied "strict scrutiny" to the classification between allopaths and osteopaths effected by the 1962 enactments. █ This, however, does not compel reversal of the judgment. "The fact that the action of the court may have been based upon an erroneous theory of the case, or upon an

improper or unsound course of reasoning, cannot determine the question of its propriety. ▮▮▮ No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].) Accordingly, we now turn to a consideration of whether the trial court's granting of summary judgment, although premised upon the use of an inappropriate constitutional test, was nevertheless correct. In so doing we address ourselves to the following basic question: Have plaintiffs successfully borne their burden to overcome the presumption of constitutionality inhering in the 1962 enactments by demonstrating, in accordance with rules governing the granting of summary judgment, that the classification between graduates of allopathic schools and graduates of osteopathic schools established by them bears no rational relationship to any conceivable legitimate state purpose?

## III

Before turning to a consideration of the affidavits and other materials presented to the trial court on the motion for summary judgment, we think it useful to define in more precise terms the nature of the classification effected by the 1962 enactments. We are not here concerned with a classification whose effect is to make it relatively more difficult for the holder of a D.O. degree to obtain licensure as a physician and surgeon than it is for the holder of an M.D. degree. Instead we deal with a classification of a more extreme nature. Whereas the licensure of holders of M.D. degrees as physicians and surgeons is provided for by the Medical Practice Act and in general involves graduation from a school approved by the medical board and successful completion of an examination administered by the medical board, the licensure of holders of D.O. degrees is *barred* without respect to the school conferring that degree or the applicant's ability to pass the examination.[14] This, we think represents a legislative judgment that no graduate of an osteopathic college, whatever his individual qualifications, shall be licensed to practice as a physician and surgeon in this state. It is that judgment, and the classification created by it, which is here subject to constitutional attack, and which, as we have in-

---

[14]That this is the effect of the 1962 enactments is, as we have noted, the law of the case in this matter. (See *D'Amico* v. *Board of Medical Examiners, supra,* 6 Cal. App.3d 716, 726.)

dicated above, must be examined pursuant to the so-called "rational relationship" standard. The specific question to be determined, then, is this: Have plaintiffs overcome the presumption of constitutionality enjoyed by the statutory classification by demonstrating that the barring of osteopathic graduates from licensure as physicians and surgeons bears no rational relationship to any conceivable legitimate state purpose?

This question, moreover, must be determined in the context of well-established rules governing summary judgment procedure.[15] " 'Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue. The aim of the procedure is to discover, through the media of affidavits, whether the parties possess evidence requiring the weighing procedures of a trial. In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts.' (*Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412, 417 . . . ; see *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132, 146-148 . . . .)" (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 851-852, fn. 6 [94 Cal.Rptr. 785, 484 P.2d 953], setting forth general rules regarding the sufficiency of affidavits, is omitted.) On the other hand this rule of caution should not be allowed to sap the summary judgment procedure of its effectiveness in cases wherein the party against whom the procedure is directed seeks to screen the lack of triable factual issues behind adept pleading. "The question therefore is not whether defendant states a good defense in his answer but whether he can show that the answer is not an attempt 'to use formal pleading as means to delay the recovery of just demands.' (*Fidelity & Deposit Co.* v. *United States,* 187 U.S. 315, 320 . . . .)" (*Coyne* v. *Krempels* (1950) 36 Cal.2d 257, 262 [223 P.2d 244].)

Finally, it is necessary to make some observations concerning the application of the foregoing rules in cases wherein the affidavits of a party incorporate by reference the fruits of its efforts under discovery procedures. It is clear beyond doubt that the consideration of such fruits on

---

[15]It should be noted that the summary judgment in this case was entered prior to the effective date of the 1973 Summary Judgment Act, January 1, 1974. Our review of the judgment therefore proceeds in the context of pre-1974 summary judgment law.

a motion for summary judgment is proper and wholly consistent with the intent and purposes of the summary judgment procedure. "When discovery, properly used, makes it 'perfectly plain that there is no substantial issue to be tried' (*Walsh* v. *Walsh, supra* [(1941) 18 Cal.2d 439 (116 P.2d 62)] at p. 442), section 437c, Code of Civil Procedure, is available for prompt disposition of the case." (*Buffalo Arms, Inc.* v. *Remler Co.* (1960) 179 Cal.App.2d 700, 703 [4 Cal.Rptr. 103]; see also *Jack* v. *Wood* (1968) 258 Cal.App.2d 639, 644 [65 Cal.Rptr. 856]; *People* ex rel. *Mosk* v. *Lynam* (1967) 253 Cal.App.2d 959, 964 [61 Cal.Rptr. 800]; *Truslow* v. *Woodruff* (1967) 252 Cal.App.2d 158, 164 [60 Cal.Rptr. 304]; *King* v. *Andersen* (1966) 242 Cal.App.2d 606, 608 [51 Cal.Rptr. 561]; *Kramer* v. *Barnes* (1963) 212 Cal.App.2d 440, 444 [27 Cal.Rptr. 895]; *Bennett* v. *Hibernia Bank* (1960) 186 Cal.App.2d 748, 753 [9 Cal.Rptr. 896]; *Newport* v. *City of Los Angeles* (1960) 184 Cal.App.2d 229, 234-236 [7 Cal.Rptr. 497]; *Thomson* v. *Honer* (1960) 179 Cal.App.2d 197, 203-204 [3 Cal.Rptr. 791]; 4 Witkin, Cal. Procedure (2d ed. 1971) Proceedings Without Trial, § 187, pp. 2836-2837; cf. Fed. Rules Civ. Proc., rule 56(c).)[16]

Moreover, when discovery has produced an admission or concession on the part of the party opposing summary judgment which demonstrates that there is no factual issue to be tried, certain of those stern requirements applicable in a normal case are relaxed or altered in their operation. Thus, in *King* v. *Andersen, supra,* 242 Cal.App.2d 606, the rule providing for liberal construction of counteraffidavits was held not to require reversal of a summary judgment for defendants where the plaintiff in an assault case, although having stated in his counteraffidavit that unnecessary force was used, nevertheless had stated in a previous deposition that no force was used; refusing to find that a triable issue was thus presented, the court said: "Where, as here, however, there is a clear and unequivocal admission by the plaintiff, himself, in his deposition . . . we are forced to conclude there is no *substantial* evidence of the existence of a triable issue of fact." (242 Cal.App.2d at p. 610.) And in *Newport* v. *City of Los Angeles, supra,* 184 Cal.App.2d 229, the sufficiency of the moving party's affidavit was challenged on the basis, inter alia, of the rule requiring that only facts within the personal knowledge of the moving party, as to which he could give competent testimony at trial, be given effect when considering the sufficiency of his affidavits. Affirming the summary judgment, the court held that the affidavit was sufficient where the moving

---

[16]It is to be observed that the 1973 Summary Judgment Act, which is not applicable to this appeal (see fn. 13, *ante*), specifically provides for the consideration of the fruits of discovery on a motion for summary judgment.

party incorporated therein verified admissions of the opposing party concerning which he, the moving party, could claim neither personal knowledge nor competency to testify. (184 Cal.App.2d at p. 236; see also *Rader v. Thrasher* (1972) 22 Cal.App.3d 883, 889-890 [99 Cal.Rptr. 670].)

The reasons for this attitude toward the legitimate products of discovery are clear. As the law recognizes in other contexts (see Evid. Code, §§ 1220-1230) admissions against interest have a very high credibility value. This is especially true when, as in this case, the admission is obtained not in the normal course of human activities and affairs but in the context of an established pretrial procedure whose purpose is to elicit facts. Accordingly, when such an admission becomes relevant to the determination, on motion for summary judgment, of whether or not there exist triable issues of *fact* (as opposed to legal issues) between the parties, it is entitled to and should receive a kind of deference not normally accorded evidentiary allegations in affidavits.. (See generally Bauman, *California Summary Judgment: A Search For a Standard* (1963) 10 U.C.L.A. L.Rev. 347, especially pp. 350-351, 357-360.)

## IV

■ With all of the foregoing in mind, we turn to the record. The pivotal question for our determination, restated in light of what we have said above, is this: Have plaintiffs borne the burden of demonstrating that the classification established by the 1962 enactments, according to which classification osteopathic graduates are barred from licensure as physicians and surgeons regardless of their individual qualifications although licensure is provided for qualified allopathic graduates, bears no rational relationship to any conceivable legitimate state interest? We think that they have.

The only legitimate state interest which might conceivably be advanced by the classification in question is that of protecting the public of this state from harm suffered at the hands of poorly trained or incompetent medical practitioners. That interest is undoubtedly a very significant one, and the substantive test which we apply insures that legislative efforts to advance it must be upheld unless the assailant can show those efforts to be intrinsically unrelated to any such advancement. Moreover, in the context of a motion for summary judgment, if it appears that there is a triable issue of fact which, upon being determined favorably to the proponents of the statutory classification, would reveal a rational relationship between the classification and the conceivable state interest, the resolution of that issue —and of the ultimate outcome of the case—would have to be deferred to a trial. Thus, for example, if in the instant case the materials before the

court on summary judgment should reveal some dispute among the parties concerning the intrinsic ability or inability of osteopathic training to produce competent and qualified physicians, then it would be error to render judgment without a full trial. Further, if some issue should appear concerning the capacity of state examining and licensing boards to adequately screen graduates of osteopathic schools in order to insure that only those who are competent and qualified should be admitted to practice—again in such a case summary judgment would be inappropriate. In short, if there were any triable issue of fact which, if resolved in favor of the proponents of the classification, might show any legitimate reason for barring osteopaths *as a class* from licensure as physicians and surgeons, it would be error to render judgment until that issue was resolved at trial.

In the instant case, however, there is no such issue. Plaintiffs have established through the medium of admissions filed by the Attorney General on behalf of the medical board[17] (1) that osteopathy, like allopathy, is a complete school of medicine and surgery whose practitioners successfully engage in the full range of activities commonly thought of as constituting medical science, including manipulation, treatment by drugs, operative surgery and physical therapy, and (2) that there exists in the state examining and licensing boards the technical capacity to screen osteopathic applicants for licensure, as allopathic applicants are now screened, so as to insure that the people of the state will be protected from incompetent and unqualified practitioners. This showing in our view demonstrates beyond peradventure of a doubt that there exists no rational relationship between the protection of the public health and the exclusion from licensure of *all* medical practitioners who have received their training in an osteopathic rather than an allopathic college and hold D.O. rather than M.D. degrees.

It has been urged, however, that in spite of the above showing there remains a very significant triable issue of fact which can be resolved only after a full trial hearing. That issue, it is suggested, is simply whether or not osteopathic training is comparable in scope and quality to allopathic training. Underlying this suggestion, of course, is the proposition that if osteopathic training is shown to be in any respect inferior to allopathic training in either scope or quality, a rational basis for the legislative classification will appear. But it is with this proposition that we cannot agree. In the first place it has been conceded that osteopathic training enables its practitioners to perform the full range of activities commonly thought of as constituting medical science—in other words, the same range of

---

[17]See text accompanying footnote 7 for the text of the subject admissions.

activities performed by doctors with allopathic training. Moreover, it has been conceded that there exists the technical and administrative machinery necessary to insure that incompetent and unqualified graduates with osteopathic training are not loosed upon the public—just as there exists similar machinery to insure that incompetent and unqualified graduates with allopathic training are not licensed.

Assuming for the purposes of argument that evidence might show differences of emphasis and quality between osteopathic training and allopathic training, would that justify the *banning* of *all* osteopathic practitioners regardless of whether their individual qualifications for performing the full range of medical services were sufficient to insure protection of the public? We think not. In short we conclude that such a showing would not, in view of the concessions before us, supply a reasonable basis for the subject classification in light of its supposed purpose. Thus, no relevant issue of fact is presented.

 For the foregoing reasons we hold that the 1962 enactments, insofar as they forbid the licensure of graduates of osteopathic colleges as physicians and surgeons in this state regardless of individual qualifications, deny to plaintiffs the equal protection of the laws guaranteed by our state and federal Constitutions and are therefore to that extent void and of no effect. Accordingly, as the trial court determined, plaintiffs are entitled to be considered for licensure, either as "new" physicians and surgeons or on the basis of reciprocity, according to the provisions of the Osteopathic and Medical Practice Acts which were applicable immediately prior to the 1962 amendments.

## V

We now turn to the matter of plaintiffs' cross-appeal.

As we have indicated (fn. 10, *ante*), plaintiffs have appealed from the judgment insofar as it omits to make a substantial award of attorneys fees to them.[18] This matter was fully briefed before the trial court at its request, and upon submission the court denied plaintiffs' request in its entirety.[19] Plaintiffs contend that a substantial award of attorneys fees

---

[18]Appended to plaintiffs' opening memorandum before the trial court was a "summation of time expended in litigation efforts" prepared by plaintiffs' attorneys. This "summation" extended in time from January 1968 to the date of the memorandum (September 1971) and indicated that over 1,900 hours had been expended in the preparation for and litigation of the action and that the value of these services was over $69,000.

[19]The notice of order filed by the court provided in relevant part: "I think the only authority I have as to fees would be in the nature of sanctions. I do not feel

should have been made by the trial court, and that its notice of order manifests a refusal on the part of that court to exercise its discretion in the matter.

■ Section 1021 of the Code of Civil Procedure provides in relevant part: "Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties . . . ." No state statute provides for the award of attorney's fees in a case of this nature, and there has been no express or implied agreement concerning attorney's fees in this case. However, appellate decisions in this state have created two nonstatutory exceptions to the general rule of section 1021, each of which is based upon inherent equitable powers of the court. The first of these is the well-established "common fund" principle: when a number of persons are entitled in common to a specific fund, and an action brought by a plaintiff or plaintiffs for the benefit of all results in the creation or preservation of that fund, such plaintiff or plaintiffs may be awarded attorney's fees out of the fund. (See, e.g., *Estate of Stauffer* (1959) 53 Cal.2d 124, 132 [346 P.2d 748]; *Estate of Reade* (1948) 31 Cal.2d 669, 671-672 [191 P.2d 745]; see generally 4 Witkin, Cal. Procedure (2d ed. 1971) Judgment, §§ 129-133, pp. 3278-3283.) The second principle, of more recent development, is the so-called "substantial benefit" rule: when a class action or corporate derivative action results in the conferral of substantial benefits, whether of a pecuniary or nonpecuniary nature, upon the defendant in such an action, that defendant may, in the exercise of the court's equitable discretion, be required to yield some of those benefits in the form of an award of attorney's fees. (See, e.g., *Knoff* v. *City etc. of San Francisco* (1969) 1 Cal.App.3d 184, 203-204 [81 Cal.Rptr. 683]; *Fletcher* v. *A. J. Industries, Inc.* (1968) 266 Cal.App.2d 313, 318-325 [72 Cal.Rptr. 146]; see also *Sprague* v. *Ticonic Bank* (1939) 307 U.S. 161 [83 L.Ed. 1184, 59 S.Ct. 777]; see generally 4 Witkin, Cal. Procedure, *supra,* Judgment, § 134, pp. 3283-3284.)

It is clear to us that neither of the aforementioned nonstatutory exceptions to the rule of section 1021 is applicable to this case. Manifestly there is no "common fund" involved here. Moreover, the "substantial benefit" rule can have no application herein for the simple reason that any "benefit" bestowed as a result of the judgment herein was bestowed on *plaintiffs* and those similarly situated, not on the medical board or the Attorney General.[20] Thus it appears that any award of attorney's fees to

further sanctions are justified[;] consequently, I have signed the Order as submitted after eliminating the provision for attorney fees."

[20]Although the Attorney General is not a party to this case, plaintiffs seek an award of attorney's fees against him as well as the medical board.

plaintiffs must be grounded in some equitable nonstatutory principle other than those heretofore recognized in this state.

Plaintiffs take refuge in a series of federal cases which, generally speaking, fall into two groups. The first group involves awards of attorney's fees to the prevailing litigant when his opponent has maintained an unfounded action or defense and has done so "in bad faith, vexatiously, wantonly or for oppressive reasons." (6 Moore, Federal Practice (2d ed. 1971) ¶ 54.77[2], p. 1709, fn. omitted.) This rationale has most recently been applied in school desegregation cases, notably *Bell* v. *School Board* (4th Cir. 1963) 321 F.2d 494, 500, and *Cato* v. *Parham* (E.D.Ark. 1968) 293 F.Supp. 1375, 1378-1379, affd. (8th Cir. 1968) 403 F.2d 12.[21] Thus, in the former case an award was upheld in light of the school board's "long continued pattern of evasion and obstruction which included not only the defendants' unyielding refusal to take any initiative, thus casting a heavy burden on the children and their parents, but their interposing a variety of administrative obstacles to thwart the valid wishes of the plaintiffs for a desegregated education." (321 F.2d at p. 500.)

Plaintiffs argue that the conduct of the medical board and the Attorney General in the instant case has been equally indefensible[22] and should warrant a substantial award of attorney's fees. What they fail to emphasize, however, is that the trial court was clearly of the view that it did possess the power within its discretion to award attorney's fees as a sanction for vexatious conduct but chose not to award such fees. ▆▆ As the notice of order we have quoted above clearly indicates, this conclusion was reached because a prior monetary sanction of $750 had already been assessed in connection with discovery (see text following fn. 6, *ante*) and the court felt that no further sanctions of this nature would be justi-

---

[21]To be distinguished from these cases are those which involve the interpretation of federal statutes providing for the award of attorney's fees. (See, for example, *Northcross* v. *Memphis Board of Education* (1973) 412 U.S. 427 [37 L.Ed.2d 48, 93 S.Ct. 2201]; *Newman* v. *Piggie Park Enterprises* (1968) 390 U.S. 400 [19 L.Ed.2d 1263, 88 S.Ct. 964].)

[22]In their reply brief plaintiffs stated: "The BOARD OF MEDICAL EXAMINERS has rejected the ruling of the Court of Appeal [on the first appeal] in later response to discovery; it has interposed delay and administrative obstacles. Stalling tactics are apparent on the record. The Attorney General[,] either controlling or supporting the vacillations of that Board[,] has been insincere in argument, continually implying that he need not justify the discrimination ruled to exist by the Court of Appeal. There have been contemptuous miscitings of law, and an obvious political motivation behind the defense supported, as it was shown to be, by the California Medical Association. These abuses require the imposition of a substantial award of attorneys fees against appellant *and* against the Attorney General (as apparent real-party-in-interest)."

fied. Thus, even assuming that a California court in a case of this nature may in its discretion award attorney's fees to one party as a sanction for vexatious and oppressive conduct on the part of another party or its counsel (a matter which we are not required to, and do not, decide today), it appears that the trial court did exercise its discretion on that basis and did determine that a prior monetary sanction was sufficient in the circumstances. We do not believe that plaintiffs have demonstrated an abuse of that discretion in awarding an amount smaller than plaintiffs might have wished. (Cf. *Clark* v. *Board of Education of Little Rock School Dist.* (8th Cir. 1966) 369 F.2d 661, 670-671.)

The second group of federal cases upon which plaintiffs rely is comprised of several recent decisions involving the development of the so-called "private attorney general" concept. (See *Bradley* v. *School Board of City of Richmond, Virginia* (E.D.Va. 1971) 53 F.R.D. 28, 42, revd. (4th Cir. 1972) 472 F.2d 318, cert. granted, 412 U.S. 937 [37 L.Ed.2d 396, 93 S.Ct. 2773]; *Lee* v. *Southern Home Sites Corp.* (5th Cir. 1971) 444 F.2d 143, 148; *Wyatt* v. *Stickney* (M.D.Ala. 1972) 344 F.Supp. 387, 408-410; *NAACP* v. *Allen* (M.D.Ala. 1972) 340 F.Supp. 703, 708-710; *Sims* v. *Amos* (M.D.Ala.1972) 340 F.Supp. 691, 694; *La Raza Unida* v. *Volpe* (N.D.Cal. 1972) 57 F.R.D. 94, 98-102.) This concept, as we understand it, seeks to encourage suits effectuating a strong congressional or national policy by awarding substantial attorney's fees, regardless of defendants' conduct, to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens. (See generally, Nussbaum, *Attorney's Fees in Public Interest Litigation* (1973) 48 N.Y.U. L.Rev. 301; Note: *Awarding Attorneys' Fees to the "Private Attorney General," Judicial Green Light to Private Litigation in the Public Interest* (1973) 24 Hastings L.J. 733.) We note, however, that the doctrine is currently under examination by the United States Supreme Court in the above-cited *Bradley* case, and, pending an announcement by the high court concerning its limits and contours on the federal level, we decline to consider its possible application in this state.

The judgment is affirmed. Plaintiffs shall recover costs on both appeals.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Clark, J., concurred.