Nathaniel A. BROWN and Nannette
Annita Brown, Plaintiffs,

v.

ORTHO DIAGNOSTIC SYSTEMS,
INC., Defendant.

C.A. No. 94–790–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 22, 1994.

Nathaniel Brown, Arlington, VA, for plaintiffs.

William B. Moffitt, Moffitt, Zwerling & Kemley, P.C., Alexandria, VA, guardian ad litem.

Thomas S. Schaufelberger, Adele Baker, Wright, Robinson, McCammon, Othimer & Tatum, Washington, DC, for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

This case presents the question, undecided in this circuit, whether a nonlawyer parent can represent his infant child on her claim for damages in a products liability suit. For the reasons stated, the Court concludes that he cannot.

### I.

This diversity[1] products liability action grows out of injuries to an unborn child alleged to have resulted from the mother's use of Defendant Ortho Diagnostic Systems, Inc.'s ("Ortho's") pharmaceutical product. Plaintiff Nannette Brown was born in April, 1991. She is the first biological child of plaintiff Nathaniel Brown and his wife, Nancy Ann Brown.[2] At some time prior to Nannette's birth, the treating physicians discovered an Rh factor incompatibility between the mother's blood type and the unborn child's blood type: Mrs. Brown is Rh-nega-

tive, while the unborn baby, Nannette, was Rh-positive, a trait she inherited from her father. The complaint alleges that when Mrs. Brown checked into Arlington Hospital in Arlington, Virginia to give birth to Nannette, she was given Ortho's product, Rho-GAM, to treat the Rh factor incompatibility.[3]

The complaint further alleges that Rho-GAM failed to work in this instance, with the result that Nannette sustained permanent injuries.[4] According to the complaint, the "package insert" for RhoGAM does not warn doctors about the risk of RhoGAM's "failure to suppress the immune response to Rh positive red blood cells when the drug is appropriately administered." Complaint at paragraph 6. This failure to warn is alleged to be a contributing cause of Nannette's injuries.

Mr. Brown filed this suit on his own behalf and as next friend of his daughter, Nannette. The complaint contains two counts, both based on an alleged breach of warranty relating to RhoGAM. The first count seeks $4,000,000 in damages for Nannette's injuries, including mental anguish, "impairment of earning capacity after attaining majority," and "permanent brain injuries." The second count seeks $1,000,000 in damages for Mr. Brown as compensation for medical expenses. Mr. Brown, a nonlawyer, did not retain a lawyer but chose instead to repre-

1. Plaintiffs are citizens of Virginia, and Defendant is a New Jersey corporation.

2. Mr. Brown and his wife also have an adopted child.

3. Approximately fifteen percent of women are Rh negative. These women do not have a protein-like substance called the "Rhesus factor," or "Rh factor," in their red blood cells. See M. Stoppard, Conception, Pregnancy and Birth 184 (1993). When these women give birth to their first Rh-positive baby, the Rh factor from the baby's blood enters the mother's blood stream, stimulating production of anti-Rh-positive antibodies. These antibodies remain in the mother's bloodstream indefinitely. If the mother becomes pregnant again with another Rh-positive baby, these antibodies will attack and destroy the red blood cells of this next baby, thereby causing hemolytic diseases of the newborn, including hyperbilirubinemia and erythroblastosis fetalis. See Springhouse Corporation, Professional Guide to Diseases 945–51 (4th ed. 1992). To prevent this from happening, Ortho's product, RhoGAM, must be administered to the mother within 48 hours of the birth of the first Rh-positive baby.

Treatment with RhoGAM ensures that the mother's antibody level following the birth of the first child remains permanently low, thereby ensuring that dangerous antibody levels will not attack the red blood cells of any subsequent Rh-positive fetus.

4. Though the merits of the claim are not before the Court in this procedural threshold motion, it is worth noting that it is unclear what role, if any, RhoGam could have played in causing harm to Nannette. If, prior to Nannette's birth, Mrs. Brown had never had a previous Rh-positive baby, a miscarriage, an abortion, or a blood transfusion, then the anti-Rh-positive antibodies would not yet have existed in Mrs. Brown's bloodstream. Not until after Nannette was born would this occur. On the other hand, if Mrs. Brown had previously had an Rh-positive baby, a miscarriage, an abortion, or a blood transfusion with Rh-positive blood, then she would have had to have been treated with RhoGAM within 48 hours after that event in order to protect Nannette and any subsequent Rh-positive baby.

sent himself. He also seeks to act as his daughter's lawyer.

In response to this situation, Ortho filed a Rule 41(b), Fed.R.Civ.P.,[5] motion to dismiss Nannette's action on the ground that Mr. Brown's representation of his daughter in connection with her claims violates Rule 17, Fed.R.Civ.P. In essence, Ortho's claim is that because nonlawyer parents have never been permitted to represent their children in federal courts, Mr. Brown's attempt to do so in the present case runs afoul of Rule 17, and hence provides a basis on which to dismiss the action. For the reasons stated below, Ortho's motion must be denied.

## II.

■ Rule 17 concerns the capacity of entities to sue and be sued. Yet, the question presented here is not who can sue or be sued, but rather who can represent whom in federal court. On this question Rule 17 is silent and is therefore inapplicable. Applicable instead is the general supervisory power of federal courts to determine whether a nonlawyer will be allowed to represent another person in court.

There is no dispute that Mr. Brown can litigate his own claim *pro se.* Indeed, his right to do so is guaranteed by 28 U.S.C. § 1654 (1994).[6] Nor is there any dispute that Nannette can sue by her father as next friend. Rule 17(c) of the Federal Rules of Civil Procedure provides that "[a]n infant ... who does not have a duly appointed representative may sue by a next friend...."[7] Hence, what is at issue is not *who* can sue, but rather whether Mr. Brown, an unlicensed layman, can act as his daughter's lawyer in court.

■ Except in the rarest of circumstances, federal courts have been uniformly hostile to attempts by non-attorneys to represent others in court proceedings.[8] And three circuits have dealt specifically with a situation where a non-attorney parent endeavors to represent his minor child's interests in court without a lawyer. All three have concluded that the parent cannot proceed without a licensed attorney when representing his minor child's interests in a lawsuit. *Meeker v. Kercher,* 782 F.2d 153 (10th Cir.1986);[9] *Osei–Afriyie*

---

5. Rule 41(b) permits dismissal of an action, *inter alia,* if a plaintiff fails to comply with the federal rules. The dismissal operates as an adjudication on the merits unless the court specifies otherwise.

6. Section 1654 reads as follows:
   "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."

7. Another avenue for Nannette to sue through her father as next friend is provided by Rule 17(b), which states that "[t]he capacity of an individual ... to sue or be sued shall be determined by the law of the individual's domicile." Virginia law provides that, "[a]ny minor entitled to sue may do so by his next friend." Va.Code § 8.01–8 (1950).

8. *See, e.g., Herrera–Venegas v. Sanchez–Rivera,* 681 F.2d 41 (1st Cir.1982) (a nonlawyer prisoner would not be permitted to appear as "Paralegal Counsel" in an appeal brought by two fellow prisoners from dismissal of their civil rights suit, although the fellow prisoners would be free to accept advice and assistance of the nonlawyer prisoner or any other prisoner); *McShane v. United States,* 366 F.2d 286, 288 (9th Cir.1966) ("While [plaintiff] may appear in propria persona in his own behalf (28 U.S.C. § 1654), that privi-

lege is personal to him. He has no authority to appear as an attorney for others than himself."); *Lindstrom v. Illinois,* 632 F.Supp. 1535 (N.D.Ill. 1986), dismissed, 828 F.2d 21 (7th Cir.1987) (an individual who was not a licensed attorney could not represent either his spouse or his church in asserting claims challenging state laws prohibiting persons not licensed as attorneys from representing others; under federal law, his spouse could present her own case or have it brought before the court by a licensed attorney, and the corporation could only appear through licensed counsel); *People ex rel. Snead v. Kirkland,* 462 F.Supp. 914 (D.C.Pa.1978) (while a layman may represent himself with respect to his individual claims, he is not authorized to act as an attorney for others in federal court).

9. The *Meeker* court rested its holding (prohibiting non-lawyer parents from representing their minor children without a lawyer) at least in part on its interpretation of Rule 17(c). 782 F.2d at 154. But linking the question of non-lawyer representation of others with Rule 17's provisions confuses the issue. As previously stated, Rule 17 concerns the capacity to sue and be sued. Part (c) of that rule says that an infant can sue through a next friend. This means that the next friend is trusted to make decisions for the minor child—whether to sue, when to sue, when and on what terms to settle, and the like. But Rule 17 does not address the question whether a non-lawyer

*v. Medical College of Pa.*, 937 F.2d 876 (3d Cir.1991); *Cheung v. Youth Orchestra Foundation of Buffalo*, 906 F.2d 59 (2d Cir.1990). Accord *Lawson v. Edwardsburg Public School*, 751 F.Supp. 1257 (W.D.Mich.1990). Accord *Lawson v. Edwardsburg Public School*.

The *Osei–Afriyie* case is particularly instructive. There, a father and his minor daughters visited Ghana, Africa and, when they returned to the United States, the daughters had malaria. After the daughters were treated for the disease in a hospital, the father filed numerous claims against the hospital on behalf of himself and his daughters. The father, a non-attorney, represented himself and his children in the case. Although the tolling of the statute of limitations for infancy was applicable and thus the children's claims should not have been time-barred, the father failed to request a jury instruction on the tolling of the statute, nor did he object to the absence of the instruction. 937 F.2d at 882. Not surprisingly, the jury found that the children's claims were time-barred. The Third Circuit reversed and remanded for a new trial. In doing so,

the panel did not pass on whether the lack of the jury instruction was reversible error, but held instead that the father, appearing *pro se*, "was not entitled to play the role of attorney for his children in federal court." The court continued,

> "[T]he infant is always the ward of every court wherein his rights or property are brought into jeopardy, and is entitled to the most jealous care that no injustice be done to him." ... The right to counsel belongs to the children, and, under [Meeker and Cheung], the parent cannot waive this right.

*Id.* at 883 (quoting *duPont v. Southern Nat'l Bank of Houston*, 771 F.2d 874, 882 (5th Cir.1985) (quoting *Richardson v. Tyson*, 110 Wis. 572, 86 N.W. 250, 251 (1901)), *cert. denied*, 475 U.S. 1085, 106 S.Ct. 1467, 89 L.Ed.2d 723 (1986)).[10]

The near uniform proscription[11] on non-lawyers representing others in court is soundly based on two separate, but complementary policy considerations.[12] First, there is a strong and compelling state interest in regulating the practice of law.[13] Regulation

---

parent, when suing as next friend of the child, must be represented by legal counsel.

**10.** The Second Circuit in *Cheung* reached a similar result for the same reason:

> [I]t is not in the interests of minors or incompetents that they be represented by non-attorneys. Where they have claims that require adjudication, they are entitled to trained legal assistance so their rights may be fully protected. There is nothing in the guardian-minor relationship that suggests that the minor's interests would be furthered by representation by the non-attorney guardian.

906 F.2d at 61.

**11.** In only one case, apparently, has a federal court permitted a person who was not a licensed attorney to represent another in litigation. *See United States v. Stockheimer*, 385 F.Supp. 979 (W.D.Wis.1974). There the court, acting within its discretion, allowed a criminal defendant who had a deep distrust of the organized bar to be represented by a disbarred attorney who had kept abreast of developments in the law since his disbarment. For his role in the *Stockheimer* case, the disbarred attorney, Gordon Peterson, was subsequently convicted and sentenced to 30 days in jail under Wisconsin law for practicing law without a license. The conviction was overturned in *United States v. Peterson*, 550 F.2d 379 (7th Cir.1977) because, the court held, it was inappropriate to apply Wisconsin law to Peter-

son's activities in federal court. As to Peterson's performance in the *Stockheimer* case: "Peterson performed the usual services of an attorney during the entire three-day [Stockheimer] trial. He sat at counsel table, conferred with Stockheimer, addressed the jury, argued motions, participated in side bar conferences and conferences in chambers, examined and cross-examined witnesses, and participated in the conference on instructions." 550 F.2d at 381.

**12.** It should be noted that litigants do not have a right, constitutional or otherwise, to be represented by non-lawyers. A contrary view "would amount to a wholesale authorization of the lay practice of law." *Turner v. American Bar Assoc.*, 407 F.Supp. 451, 478 (N.D.Tex.1975).

**13.** For an excellent sketch of the history of British and American control of the legal profession, and a detailed articulation of the policy reasons governing the need for such control, see *Turner v. American Bar Assoc.*, 407 F.Supp. 451, 472–79 (N.D.Tex.1975).

This state interest is, of course, subject to the statutory right of parties to conduct their own cases under 28 U.S.C. § 1654. Moreover, criminal defendants have a constitutional right under the Sixth Amendment to proceed without a lawyer if they so choose. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

that excludes non-lawyers from representing others reflects that the conduct of litigation by a nonlawyer creates unusual burdens not only for the party he represents, but also for his adversaries and the court. The lay litigant frequently files pleadings that are awkwardly drafted, motions that are inarticulately presented, proceedings that are needlessly multiplicative. In addition to lacking the professional skills of a lawyer, the lay litigant lacks many of the attorney's ethical responsibilities, including, importantly, the duty to avoid litigating unfounded or vexations claims. *See Lindstrom*, 632 F.Supp. at 1538 (quoting *Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir.1983)).

The second reason unlicensed laymen are not typically permitted to represent others in court concerns the importance of what is at stake for the litigant, and the final nature of the adjudication of the rights in question. Thus, a party may be bound, or its rights waived, by its legal representative. When that representative is a licensed attorney there are grounds to believe that the representative's character, knowledge and training are equal to the responsibility.[14] In addition, remedies and sanctions are available against the lawyer that are not available against nonlawyers, including ethical misconduct sanctions and malpractice suits. In sum, litigation is akin to navigating hazardous waters; federal courts are willing to allow individuals to steer their own boats, and perhaps founder or run aground; but federal courts are not willing to permit individuals to risk the safety of others' boats.

 This case falls squarely within the ambit of the principles that militate against allowing non-lawyers to represent others in court. As a layman, Mr. Brown lacks the legal training necessary to pursue this complex products-liability action effectively. He is neither bound by a licensed attorney's ethical responsibilities, nor subject to the internal discipline of the bar. Accordingly, Mr. Brown cannot act as Nannette's attorney in this matter. He may, however, continue to prosecute his own claims *pro se*, and he may also act as next friend to Nannette, making litigation-related decisions on her behalf in consultation with her attorney.[15]

 In summary, Ortho's contention that Mr. Brown may not act as his daughter's lawyer is well taken. But contrary to Ortho's contention, Mr. Brown's attempt to do so is not a violation of Rules 17 or 41. And dismissal of Nannette's claim on this ground is certainly unwarranted. Rather, all that is required is for the Court to appoint counsel for Nannette, which has now been done.[16]

The appropriate orders have issued.

---

**14.** No case has been found focusing on whether a parent who is a licensed attorney can undertake to act as his minor child's lawyer in court.

**15.** This process has already commenced. While considering Ortho's motion, the Court for Nannette's protection and pursuant to Rule 17(c), Fed.R.Civ.P., appointed a guardian ad litem for her to consider whether her claim against Ortho should be postponed to permit a more accurate assessment of the harm she has suffered, if any. Although the guardian ad litem recommended postponement, Mr. Brown believes both his and his daughter's claims should be pursued at this time. Given this, the Court, pursuant to its general supervisory powers, has appointed counsel to represent Nannette in connection with her claim, if any, against Ortho.

**16.** The authority to appoint counsel to represent Nannette in this case derives from 28 U.S.C. § 1915(d), which provides that a court may request an attorney to represent a civil litigant proceeding in forma pauperis. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir.1984) (stating that although § 1915(d) states that a court may "request" an attorney, this has been construed as authorizing a court to "appoint" counsel). But before counsel may be appointed pursuant to § 1915, courts must take into account a variety of factors, including the complexity of factual and legal issues presented, whether the litigant has a colorable claim, whether appointment of counsel would lead to a more just and expeditious result, and the nature of the litigant's unsuccessful efforts to retain counsel. *Hodge v. Police Officers*, 802 F.2d 58, 60 (2d Cir.1986); *Gordon v. Leeke*, 574 F.2d 1147, 1178 (4th Cir. 1978); *Maclin v. Freake*, 650 F.2d 885 (7th Cir. 1981); *Ulmer v. Chancellor*, 691 F.2d 209, 213 (5th Cir.1982).

While the merits of Nannette's claim against Ortho are in substantial doubt, *see supra* n. 4, the Court concludes that this is an appropriate case for the appointment of counsel because the factu-

al issues are too complex technically to permit the court to reach confident merits conclusions

without the aid of counsel.