[No. S047749. Dec. 4, 1997.]

PACIFIC GAS AND ELECTRIC COMPANY, Plaintiff and Appellant, v. COUNTY OF STANISLAUS et al., Defendants and Respondents.

## COUNSEL

Nossaman, Guthner, Knox & Elliott, William T. Bagley, Douglas J. Maloney, Alan D. Miller, J. Michael Reidenbach, Joshua Bar-Lev, McKenna & Cuneo and Howard V. Golub for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Thomas Greene, Assistant Attorney General, Richard N. Light and Sanford N. Gruskin, Deputy Attoneys General, Sedgwick, Detert, Moran & Arnold, Frederick D. Baker, Kirk C. Jenkins, O'Melveny & Myers, Henry C. Thumann and Steven P. Basileo as Amici Curiae on behalf of Plaintiff and Appellant.

Michael H. Krausnick, County Counsel, and Andrew N. Eshoo, Deputy County Counsel, for Defendants and Respondents.

## OPINION

KENNARD, J.—In this case, a California county brought a class action in the federal court, alleging that a utility company had violated state and federal antitrust laws by illegal price-fixing that had substantially increased the county's costs for natural gas. The utility company then initiated this lawsuit in the state court challenging the county's power to bring the federal action, contending that only the state Attorney General may bring antitrust actions on a county's behalf when, as here, the alleged illegal activities and injuries occurred primarily outside the county. We conclude that the county was entitled to bring the action.

I

On December 3, 1993, Stanislaus County and Mary Grogan, a residential consumer of natural gas, brought a class action in the United States District

Court for the Eastern District of California "on behalf of themselves, and all entities and persons similarly situated." Named as defendants were the Pacific Gas and Electric Company (hereafter PG&E) and the Pacific Gas Transmission Company (hereafter PGT), a wholly owned subsidiary of PG&E. The complaint alleged that PG&E and PGT had conspired with a number of producers and distributors to fix the price of natural gas imported into California from western Canada. Counts I, II, and III alleged violations of federal law under the Sherman Antitrust Act (15 U.S.C. § 1), the Wilson Tariff Act (15 U.S.C. § 8 et seq.), and the Clayton Act (15 U.S.C. § 15). Counts IV and V alleged violations of California law under the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.)[1] and the Unfair Practices Act (§ 17000 et seq.). The complaint also alleged that the "relevant geographic market" in which the injured consumers were located was "Central and Northern California."

Representing Stanislaus County in its action in federal court were county counsel and retained outside counsel.

While the federal lawsuit was pending, PG&E brought, in the Superior Court of Stanislaus County, this taxpayers' action for injunctive and declaratory relief, naming as defendants the County of Stanislaus, the Stanislaus County Board of Supervisors (both collectively and individually), and the Stanislaus County Auditor/Controller. (For convenience, defendants are hereafter collectively referred to as the County.) PG&E alleged that by bringing the federal class action, the County had exceeded the powers vested in it by law, and that the federal class action therefore constituted an illegal expenditure of public funds. PG&E's complaint sought an order enjoining the County from expending public funds to pursue the federal action (Code Civ. Proc., § 526a) and a declaration that the County's expenditure of such funds was illegal.

The County demurred to the complaint. The trial court sustained the demurrer without leave to amend, ruling that the County had the power to bring its federal antitrust action and that PG&E's complaint for injunctive and declaratory relief failed to state facts sufficient to constitute a cause of action.[2] PG&E appealed from the resulting judgment of dismissal.

The Court of Appeal affirmed. Citing subdivisions (a) and (b) of section 16750, it held that the County could bring a class action alleging antitrust

---

[1] Unless otherwise stated, all subsequent statutory references are to the Business and Professions Code.

[2] In the trial court, the County challenged the propriety of PG&E's use of a taxpayers' action as a method of challenging the County's power to bring its antitrust action in federal court, but the County does not do so here. We express no views on the propriety of using a taxpayers' action for this purpose.

violations of the state Cartwright Act. The court did not address PG&E's claim that the County lacked the power to bring a class action alleging federal antitrust violations, even though PG&E had raised this claim both in its opening brief and in a timely petition for rehearing.[3] We granted PG&E's petition for review to address both claims.[4]

## II

PG&E contends that the County lacked the authority, in its lawsuit in federal court, to allege a cause of action under the state Cartwright Act, because the asserted violations and injuries occurred primarily *outside* the county boundaries. PG&E does not dispute that consumers injured by violations of the state Cartwright Act may generally bring class actions under the act. It asserts, however, that when, as here, the injured consumer is not an individual but a county, and the violation and injury occur primarily beyond the county's boundaries, only the state Attorney General has the authority to sue on a county's behalf for violations of the Cartwright Act.[5] Before addressing this complex issue, we give a brief overview of the relevant provisions of the statutory scheme involved here.

Our Legislature enacted the Cartwright Act in 1907. The act "generally outlaws any combinations or agreements which restrain trade or competition or which fix or control prices" (Antitrust and Trade Reg. Law Section of the State Bar of Cal., Cal. Antitrust Law (1991) p. 4), and declares that, with certain exceptions, "every trust is unlawful, against public policy and void" (§ 16726).

---

[3] The trial court's written ruling and the Court of Appeal's opinion do not address whether the County had the capacity to allege, in its federal lawsuit, its cause of action for unfair competition under the Unfair Practices Act (§ 17000 et seq.). Neither PG&E's petition for review nor the briefs of the parties in this court mention the matter. Accordingly, we do not consider the propriety of the County's cause of action for unfair competition.

[4] On January 16, 1996, shortly after we granted review of this matter, the federal district court dismissed the County's class action for reasons unrelated to the issues in this case. On appeal, the United States Court of Appeals for the Ninth Circuit upheld the dismissal. (*County of Stanislaus* v. *Pacific Gas and Elec. Co.* (9th Cir. 1997) 114 F.3d 858.) Neither party has argued that the dismissal has rendered this case moot. Although PG&E's cause of action seeking injunctive relief appears moot, a live controversy may remain regarding its request for declaratory relief. (See *Van Atta* v. *Scott* (1980) 27 Cal.3d 424, 449-450 [166 Cal.Rptr. 149, 613 P.2d 210]; *Stanson* v. *Mott* (1976) 17 Cal.3d 206, 223 [130 Cal.Rptr. 697, 551 P.2d 1].) Moreover, because PG&E's assertion that the County lacks the power to bring its antitrust action is an issue of substantial public interest that is likely to recur, we may reach the merits of the appeal even if the allegedly illegal action has been completed. (*John A.* v. *San Bernardino City Unified School Dist.* (1982) 33 Cal.3d 301, 307 [33 Cal.3d 301, 187 Cal.Rptr. 472, 654 P.2d 242]; *Cota* v. *County of Los Angeles* (1980) 105 Cal.App.3d 282, 289 [164 Cal.Rptr. 323].)

[5] In part IV. below, we address PG&E's additional claim that the County also lacked the power to bring an action under federal antitrust law.

The Cartwright Act may be enforced by a criminal proceeding, by an action for corporate dissolution or for revocation of license, or by a civil action for injunctive relief and treble damages as involved here. To determine whether in this case the County has the authority to bring such a civil action, we must consider these provisions of the act: sections 16750, 16754, and 16760.

Section 16754 permits the state Attorney General or the district attorney of any county to initiate either civil or criminal proceedings for violation of the state Cartwright Act; the action may be brought in the superior court of any county in which any portion of the offense was committed, where any of the defendants reside or where any corporate defendant does business. This section further provides that if a county's district attorney brings an antitrust action, the state Attorney General "shall have all of the powers set forth in section 12550 of the Government Code"; the latter provision gives the Attorney General "direct supervision" over any district attorney pursuing an "investigation or prosecution of violations of law of which the superior court has jurisdiction," and it allows the Attorney General to assist in or to "take full charge" of such investigations and prosecutions.

Section 16760 authorizes the Attorney General and district attorneys to bring *parens patriae* actions on behalf of state residents injured by violations of the state Cartwright Act.[6] Thus, subdivision (a) of section 16760 permits the Attorney General to bring "a civil action in the name of the people of the State of California, as parens patriae on behalf of natural persons residing in the state" for treble damages arising from violations of the Cartwright Act. And, under subdivision (g), such an action may also be brought by the district attorney of any county on behalf of the residents of the county "whenever it appears that the activities giving rise to such prosecution or the effects of such activities occur primarily within such county."

The third section addressing standing to bring a civil action for treble damages is section 16750. This is the provision on which the Court of Appeal in this case relied in concluding that the County is authorized to bring an antitrust claim against PG&E. We therefore review it in detail.

Section 16750, subdivision (a) provides: "Any *person* who is injured in his or her business or property by reason of anything forbidden or declared unlawful" by the Cartwright Act may sue for treble damages, interest, attorneys' fees, and injunctive relief. (Italics added.)

---

[6] "'Parens patriae,' literally 'parent of the country,' refers traditionally to [the] role of [the] state as sovereign and guardian of persons under legal disability [¶] . . . [¶] State attorney generals [sic] have *parens patriae* authority to bring actions on behalf of state residents for anti-trust offenses and to recover on their behalf." (Black's Law Dic. (6th ed. 1990) p. 1114, col. 1.)

Under subdivision (b) of section 16750, the State of California "and any of its political subdivisions and public agencies" is deemed a "person."

Subdivision (c) of section 16750 authorizes the state Attorney General to bring "an action on behalf of the state or of any of its political subdivisions or public agencies to recover the damages provided for by this section, or by any comparable provision of federal law . . . ." Before doing so, however, the Attorney General must give the entity in question written notice of intent to bring the action on the entity's behalf. The entity then has 30 days to decide whether to divest the Attorney General of such authority.

Subdivision (d) of section 16750 provides that when the state brings an antitrust action "in which the Attorney General is the class representative of political subdivisions, public agencies, or citizens of the state," the state "shall retain" attorney fees awarded in the action.

Under subdivision (e) of section 16750, when the state Attorney General brings a federal or a state antitrust action, the Attorney General may enter into contracts with others who have brought similar actions to share common expenses or to otherwise cooperate in pursuing the matter. And the Attorney General may either render legal services to, or obtain legal services from, "any department or agency of the United States, of this state or any other state or any department or agency thereof, any county, city, public corporation or public district of this state or of any other state, that has brought or intends to bring a similar action . . . , or their duly authorized legal representatives . . . ." (Subdivision (h) of section 16750 grants the same authority to district attorneys.)

Subdivision (g) of section 16750 allows "[t]he district attorney of any county" to "prosecute any action on behalf of such county or any city or public agency or political subdivision located wholly *within* such county which the Attorney General is authorized to bring pursuant to subdivision (c) of this section, whenever it appears that the activities giving rise to such prosecution or the effects of such activities occur primarily within such county." (Italics added.) Before bringing such an action, the district attorney must give a 30-day written notice to the state Attorney General. The notice must include a report setting forth the facts giving rise to the action as well as a copy of the proposed complaint. Before settling any such action, the district attorney must give the Attorney General a copy of, and a memorandum explaining, the proposed settlement agreement.

Subdivision (i) of section 16750 provides that in any action brought under subdivision (g), the district attorney may "represent any political subdivision

located within his or her county directly." Before doing so, however, the district attorney must give such entities written notice and an opportunity to withdraw from the action. And in any action brought under subdivision (g) "in which the county, through the district attorney, is the class representative of political subdivisions located within such county," the district attorney "shall retain" attorney fees awarded in the action.

The remaining portions of section 16750—subdivisions (f) and (j)—concern the disposition of funds awarded to the state Attorney General in actions for violation of the state Cartwright Act and the Hart-Scott-Rodino Antitrust Improvements Act of 1976. They are irrelevant here.

## III

PG&E contends that the County is not entitled, in its antitrust suit in federal court, to allege antitrust violations under the state Cartwright Act. PG&E does not appear to dispute the County's *capacity* to sue, that is, that the County is an appropriate *party* to a class action lawsuit under the Cartwright Act. PG&E insists, however, that only the state Attorney General could bring a lawsuit on the County's behalf, and that the County lacked the authority to bring its own action. We disagree.

Subdivision (a) of section 16750 provides that "any person" injured by a violation of the state Cartwright Act may bring a civil action. Subdivision (b) defines "person" as including the state and "any of its political subdivisions and public agencies." Therefore Stanislaus County, a political subdivision of the State of California (Gov. Code, § 23000) with the right to "[s]ue and be sued" (*id.*, § 23004, subd. (a)), is a "person" entitled to bring a civil action for a violation of the Cartwright Act. The County is governed by a board of supervisors. Unless otherwise specified by law, a county may act only through its board of supervisors (*id.*, § 23005), which "shall direct and control the conduct of litigation in which the county . . . is a party" (*id.*, § 25203). Thus, subdivisions (a) and (b) of section 16750 authorize the County, under the direction of its board of supervisors, to bring an antitrust action under the Cartwright Act.

PG&E acknowledges that when read in isolation, subdivisions (a) and (b) of section 16750 "might arguably" support the County's claim that it was authorized to bring an action under the Cartwright Act. But PG&E contends that the express language of the remainder of section 16750 denies the County such authority. According to PG&E, section 16750 permits a county to bring a multicounty antitrust class action only if (1) the state Attorney General brings the action on behalf of the county (§ 16750, subd. (c)) or (2)

the district attorney of a county brings the antitrust action, when the alleged improper conduct or its effects occurred primarily *within* the county (§ 16750, subd. (g)). PG&E points out that here the County's antitrust class action in federal court alleging that PG&E had violated the Cartwright Act was brought by neither the state Attorney General nor the County's district attorney (as we mentioned earlier, the action was brought by county counsel, with the assistance of outside counsel), and the County's federal lawsuit did not allege that the improper conduct or injuries occurred primarily *within* its borders. Therefore, PG&E argues, subdivisions (c) and (g) of section 16750 preclude the County from bringing its state antitrust class action in federal court.

We disagree. Subdivisions (c) and (g) of section 16750 do not expressly limit the County's authority to bring an antitrust action under the state Cartwright Act. Subdivision (c) authorizes the state Attorney General to sue on behalf of political subdivisions in the state; subdivision (g) authorizes a district attorney to sue on behalf of political subdivisions within the district attorney's county. Neither subdivision limits the power of counties or other political subdivisions to sue on their own behalf for injuries resulting from violations of the Cartwright Act.

PG&E nevertheless insists that subdivision (g) of section 16750 directly limits the County's power to sue under the state Cartwright Act. It does not; what it does is to limit the power of the *district attorney*. The district attorney is a "public prosecutor" (Gov. Code, § 26500), an elected official who "shall initiate and conduct on behalf of the people all prosecutions for public offenses" (*ibid.*), subject to the "direct supervision" of the state Attorney General (Cal. Const., art. V, § 13). The County is governed by a board of supervisors, a separate and distinct body of elected officials which is prohibited from interfering with the investigative and prosecutorial functions of the district attorney. (Gov. Code, § 25303.) In civil suits a county is ordinarily represented not by the district attorney but by county counsel (*id.,* § 26529 [County counsel "shall defend or prosecute all civil actions and proceedings in which the county or any of its officers is concerned or is a party in his or her official capacity."]); when the board of supervisors deems it appropriate, county counsel may be assisted by outside counsel (*id.,* § 25203).

Subdivisions (c) and (g) of section 16750 give the state Attorney General the authority to bring state antitrust actions on behalf of the state's political subdivisions; they also give district attorneys comparable authority to bring state antitrust actions on behalf of political subdivisions within their respective counties. But neither subdivision (c) nor subdivision (g) of section

16750 divests a county or other local public entity of authority it otherwise possesses—under subdivisions (a) and (b) of the same section—to bring an action on its own behalf. Rather, subdivisions (c) and (g) simply establish *additional* avenues for pursuing Cartwright Act claims.

PG&E argues, however, that even if section 16750 does not *expressly* prohibit the County from filing a class action lawsuit for antitrust violations under the state Cartwright Act when both the alleged illegal acts and their effects occur primarily *outside* the County's boundaries, to permit the County to do so would be inconsistent with the overall *purpose* of section 16750 and its companion sections, as reflected in their legislative history.

■ The goal of statutory construction is to ascertain and effectuate the intent of the Legislature. (*Hsu* v. *Abbara* (1995) 9 Cal.4th 863, 871 [39 Cal.Rptr.2d 824, 891 P.2d 804].) Ordinarily, the words of the statute provide the most reliable indication of legislative intent. (*Ibid.*) When the statutory language is ambiguous, the court may examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes. (*Ibid.*; *Woods* v. *Young* (1991) 53 Cal.3d 315, 323 [279 Cal.Rptr. 613, 807 P.2d 455].) " 'Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.' " (*California Teachers Assn.* v. *Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 659 [59 Cal.Rptr.2d 671, 927 P.2d 1175].)

■ We have already concluded that the most reliable indication of legislative intent—the words of section 16750—do not support PG&E's proposed construction. Although we find little if any ambiguity in the statutory language, we nonetheless review the legislative history of section 16750 and related provisions to determine whether the Legislature may have intended some restriction, not manifest in the statutory language, on a county's authority to bring a Cartwright Act suit on its own behalf.

Through its enactment of section 16750, the Legislature created a civil remedy for antitrust violations. As originally enacted in 1941, the section simply provided that "any person" injured by a violation of the Cartwright Act could bring a civil action for twice the actual damages (increased to treble damages in 1959); it did not state whether government entities were covered by its provisions. (Stats. 1941, ch. 526, § 1, p. 1834; Stats. 1959, ch. 2078, § 1, p. 4811.)

Thereafter, in 1961, the Legislature amended section 16750 to clarify that government entities could bring civil actions under the Cartwright Act.

(Stats. 1961, ch. 1023, § 1, p. 2705.) The original 1941 section was renumbered as subdivision (a). Added were subdivisions (b) ("[t]he State and any of its political subdivisions and public agencies shall be deemed a person . . . .") and (c) (providing that the Attorney General could bring an action on behalf of the state and its political subdivisions, so long as such subdivisions were given notice and an opportunity to withdraw). The Legislature gave these reasons for the amendment: "Subdivision (b) is added to [section 16750] for the purpose of clarification only and is not to be construed or interpreted as an indication that the State or any of its political subdivisions or public agencies is not a person within the meaning of Section 16750 as originally enacted . . . . The Legislature hereby further declares that at the time of the original enactment of Section 16750, and at all times since, it intended that the State, its political subdivisions and public agencies be included within the meaning of the word 'person.'" (Stats. 1961, ch. 1023, § 2, p. 2706.)

When the Legislature amended section 16750 in 1961, it also amended a companion provision, section 16754. Originally, section 16754 had provided that violators of the Cartwright Act could be ordered to forfeit $50 for every day on which the antitrust violation continued, and it had authorized the state Attorney General and the district attorney of any county to bring an action for recovery of the forfeiture. (Stats. 1941, ch. 526, § 1, p. 1834.) The 1961 amendment empowered the Attorney General, or a district attorney "on the order of the Attorney General," to bring civil actions or criminal proceedings for violations of the state Cartwright Act. (Stats. 1961, ch. 757, § 1, p. 2013.)

In 1969, the Legislature again amended section 16750 to add a provision (originally labeled subdivision (d) but now subdivision (e)) permitting the Attorney General to enter into contracts and cooperate with private parties and other government entities bringing antitrust actions. (Stats. 1969, ch. 1234, § 1, p. 2395.) In 1972, the Legislature added subdivisions (d) (permitting the state to retain attorney fees when the Attorney General is the class representative) and (f) (regulating the disbursement of funds awarded the Attorney General in actions under the Cartwright Act). (Stats. 1972, ch. 1140, § 1, p. 2207.)

In 1977, the Legislature once again amended section 16750, adding subdivisions (g), (h), and (i) (granting district attorneys the power to bring civil actions under the Cartwright Act, and establishing rules governing the exercise of that power), and subdivision (j) (concerning the Hart-Scott-Rodino Antitrust Improvements Act of 1976). (Stats. 1977, ch. 540, § 1, p. 1741.) Simultaneously, the Legislature amended section 16754 to delete the restriction that district attorneys could bring civil or criminal actions under

the Cartwright Act only "on the order of the Attorney General," and replace it with the current language authorizing the district attorney to bring such actions "subject to the notice requirements of subdivision (g) of section 16750." (Stats. 1977, ch. 540, § 3, p. 1744.) At the same time, the Legislature enacted section 16760, authorizing the state Attorney General and the district attorney of any county to bring *parens patriae* actions (Stats. 1977, ch. 543, § 1, p. 1747), and section 16759, granting district attorneys subpoena powers comparable to those of the Attorney General for the purpose of investigating potential antitrust violations (Stats. 1977, ch. 542, § 1, p. 1746).

In arguing that the legislative history supports their construction of section 16750, PG&E and its amici curiae allies focus primarily on two statutory revisions: the 1961 legislation that added subdivision (b) to section 16750 and simultaneously amended section 16754, and the 1977 legislation that added subdivisions (g) through (j) to section 16750 and simultaneously added and revised other provisions of the Cartwright Act. We first consider the 1961 legislation.

The state Attorney General, who has filed an amicus curiae brief on behalf of PG&E, points out that in 1961, when the Legislature amended section 16750 of the Cartwright Act to provide that "[t]he state and any of its political subdivisions and public agencies shall be deemed a person . . ." (Stats. 1961, ch. 1023, § 1, p. 2706), it also amended another provision, section 16754, to provide that "[t]he Attorney General, or the district attorney of any county on order of the Attorney General, shall institute civil actions or criminal proceedings for violation of this chapter" (Stats. 1961, ch. 757, § 1, p. 2013). The Attorney General argues that because the amendments to sections 16750 and 16754 were enacted at the same time, they must be read together. When this is done, the Attorney General contends, these two amendments permit only the Attorney General, or a district attorney on order of the Attorney General, to bring treble-damage antitrust actions on behalf of the state, or its political subdivisions and public agencies. Thus, under the Attorney General's construction of these 1961 amendments, a county, city, or other political subdivision could *never* sue on its own behalf under the Cartwright Act.

We find the Attorney General's argument unpersuasive. The 1961 amendments to sections 16750 and 16754 of the Cartwright Act authorize the state Attorney General and the district attorney of any county to bring criminal and civil actions for antitrust violations. But they also clarify that counties, cities, and other political subdivisions have the power to sue. There is nothing in the legislative history leading to the adoption of the 1961 amendments to suggest that they were enacted to bar counties, cities, and other

political subdivisions from suing for injuries resulting from antitrust violations under the Cartwright Act.

This conclusion is reinforced by the statement of purpose that the Legislature included with its 1961 amendment to section 16750. As previously noted, the Legislature explained that in adding subdivision (b) to the section, to provide that the state and any of its political subdivisions "shall be deemed a person," the Legislature sought to clarify that when it originally enacted section 16750, it intended "that the State, its political subdivisions and public agencies be included within the meaning of the word 'person.'" (Stats. 1961, ch. 1023, § 1, p. 2706.) Thus, the 1961 amendments were enacted to remove any doubts concerning the power of local government to bring antitrust actions under the Cartwright Act; they were not enacted to abrogate the rights of local entities to bring such actions on their own behalf.

Next, PG&E and its amici curiae allies argue that the 1977 amendments to section 16750 limit the County's power to bring antitrust actions. In that year, the Legislature added several subdivisions, most significantly subdivision (g), to section 16750. As explained earlier, subdivision (g) authorizes the district attorney of any county to "(prosecute) any action on behalf of such county or any city or public agency or political subdivision located wholly within such county which the Attorney General is authorized to bring pursuant to subdivision (c) . . . whenever it appears that the activities giving rise to such prosecution or the effects of such activities occur primarily within such county." At the same time, the Legislature amended section 16754 to provide that district attorneys could bring civil and criminal actions under the Cartwright Act "subject to the notice requirements of subdivision (g) of section 16750." (Stats. 1977, ch. 540, § 3, p. 1744.)

PG&E asserts that to construe subdivisions (a) (all "persons" may sue for violation of the Cartwright Act) and (b) (political subdivisions are "persons") of section 16750 as permitting counties to bring actions for violations of the Cartwright Act would "render subdivision (g) [of section 16750] meaningless." PG&E contends that the Legislature added subdivision (g) to section 16750 because "all concerned . . . perceived the need for statutory amendment before counties could pursue antitrust action." Responding to this need, PG&E argues, the Legislature made "a carefully circumscribed grant of authority" to district attorneys. If counties, cities, and other political subdivisions were already entitled to file suit under the Cartwright Act, PG&E contends, there would have been no need for the Legislature to enact subdivision (g).

We disagree. Subdivisions (a) and (b) of section 16750 authorize counties to bring antitrust actions under the Cartwright Act; they do not, however,

authorize a *district attorney* to bring such actions on behalf of the counties, cities and other political subdivisions within the district attorney's county. Thus, if subdivision (g) of section 16750 did not exist, a district attorney of a county would be unable to bring civil actions for antitrust violations of the state Cartwright Act on behalf of these entities. (See generally, *Safer* v. *Superior Court* (1975) 15 Cal.3d 230, 235-237 [124 Cal.Rptr. 174, 540 P.2d 14].) Therefore, subdivision (g), which authorizes the district attorney to bring such actions, is not rendered meaningless by our conclusion that counties have the power, under subdivisions (a) and (b), to bring an antitrust action under the Cartwright Act.

There is nothing in the legislative history of the 1977 revisions to support PG&E's assertion that those amendments were motivated by a legislative concern that counties, cities, and other political subdivisions lacked the authority to bring antitrust actions under the Cartwright Act. Rather, the legislative history demonstrates a legislative concern to strengthen the *district attorney's* authority in the antitrust arena. A Senate Judiciary Committee report on a portion of the legislation stated: "This is part of a package of bills before the committee . . . which were introduced at the request of the L.A. County District Attorney. The bills are intended to strengthen a *district attorney's* ability to prosecute anti-trust and restraint of trade violations." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1158 (1977-1978 Reg. Sess.) pp. 1-2, italics added.) Similarly, an analysis by the Assembly Judiciary Committee stated: "Under existing law, the Attorney General can bring an action on behalf of the state or any of its political subdivisions to recover damages under the state antitrust laws. This bill grants comparable authority to local *district attorneys*." (Assem. Com. on Judiciary, bill digest prepared for May 5, 1977, hearing (1977-1978 Reg. Sess.) p. 1, italics added.)[7]

Also, to hold, as urged by PG&E and its amici curiae allies, that counties, cities, and other political subdivisions lack the power to bring their own civil actions for injuries resulting from antitrust violations under the Cartwright Act would be inconsistent with subdivision (e) of section 16750. As discussed previously, subdivision (e) provides that when the state Attorney General brings a civil action alleging federal or state antitrust violations, he or she may pool legal resources with "any county, city, public corporation or

---

[7]For similar reasons, we reject PG&E's assertion that the Legislature's intent to deny counties the right to file suit on their own behalf is shown by its rejection in 1975 of Assembly Bill No. 1624, a bill proposing to increase the power of district attorneys to bring antitrust actions that was similar to the amendments to section 16750 that the Legislature later enacted in 1977. This proposed legislation concerned the power of district attorneys to bring antitrust actions, not the power of counties, cities, and other political subdivisions to file suit on their own behalf.

public district of this state . . . that has brought or intends to bring a similar action . . . ." Thus, this provision of section 16750 recognizes that not only the Attorney General and local district attorneys, but also "any county, city, public corporation or public district of this state" may bring a civil action under the Cartwright Act.

According to PG&E and its amici curiae allies, to construe section 16750 as permitting counties to file class action antitrust suits on behalf of themselves and others similarly situated would produce "anomalous, irrational, and absurd results." They foresee the initiation of duplicative antitrust lawsuits by cities, counties, and other political subdivisions, thereby placing "multi-county business at constant risk of being called upon to defend expensive and burdensome antitrust investigations and lawsuits in far-flung corners of the state." But multicounty businesses already face this risk, for they may be sued by any or all of their *private* customers in "far-flung corners of the state." Our holding merely places injured *government* consumers on an equal footing with *private consumers* to obtain redress for violations of California's antitrust laws. Counties that have been injured by price-fixing (as alleged here) or other activities that violate the Cartwright Act are no different from other persons or businesses that have been injured by such conduct. Contrary to PG&E's argument, it is not "anomalous, irrational, and absurd" to conclude that the Legislature intended to give them the same power to sue that it gave to all other consumers injured by a company's antitrust violations.

The dissent, relying on federal cases construing federal laws and laws of other states, bases its conclusion that counties lack the authority to bring actions under the Cartwright Act on the "presumption" that "[u]*nless the contrary appears affirmatively by statute, the Attorney General has exclusive authority to institute Cartwright Act antitrust proceedings on behalf of all government entities.*" (Dis. opn., *post,* at p. 1161, original italics.) This presumption is inconsistent with California law, which explicitly provides that a county's board of supervisors, not the state Attorney General, directs and controls litigation in which a county is a party (Gov. Code, § 25203), and that county counsel, not the state Attorney General, ordinarily represents counties in civil actions (*id.,* § 26529). The dissent makes no effort to reconcile its presumption with these statutes, and indeed does not even acknowledge their existence. Although the dissent accuses the majority of "reading subdivisions (a) and (b) of section 16750 as 'stand alone' provisions unrelated to the rest of the statute" (dis. opn., *post,* at p. 1163), it is

actually the dissent that treats section 16750 as a "stand alone" provision, ignoring the other relevant sections mentioned above.[8]

## IV

■ PG&E contends that even if the County may bring an antitrust action under the state Cartwright Act, it lacked the capacity in its federal lawsuit to allege violations of *federal* antitrust laws. The capacity to bring an action under federal law, PG&E points out, is governed by the law of the state in which the district court where the action was brought is located. (Fed. Rules Civ. Proc., rule 17(b), 28 U.S.C. [with certain exceptions not relevant here, "capacity to sue or be sued shall be determined by the law of the state in which the district court is held . . . ."]; *Hillis Motors, Inc.* v. *Hawaii Auto. Dealers' Ass'n.* (9th Cir. 1993) 997 F.2d 581, 584.) The County brought its federal antitrust action in the district court for the Eastern District of California. Accordingly, California law governs the County's capacity to allege violations of federal antitrust laws in its federal lawsuit.

PG&E argues that under the California Constitution, counties do not have the inherent power to sue; rather, the Constitution has vested the Legislature with the power to determine the circumstances in which counties may sue and be sued. According to PG&E, the Legislature has not granted counties authority to bring federal antitrust actions. Although we agree with PG&E that the state Constitution does not give counties the inherent power to sue, we conclude that the Legislature has given them the power to do so, as we explain below.

The California Constitution authorizes the Legislature to enact legislation specifying the powers of counties. (Cal. Const., art. XI, § 1, subd. (b) ["The Legislature shall provide for county powers . . . ."].) Thus, under California law, counties may sue or be sued only if so authorized by the Legislature: "The county is merely a political subdivision of state government, exercising only the powers of the state, granted by the state . . . ." (*County of Marin* v. *Superior Court* (1960) 53 Cal.2d 633, 638 [2 Cal.Rptr. 758, 349 P.2d 526].)

The Legislature, however, has declared that counties have "corporate powers" (Gov. Code, § 23000) and that those powers include the right to

---

[8]The dissent also cites *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10], which explains that the state Attorney General has broad common law powers to file civil actions in proceedings involving the interests of the state. *D'Amico* says nothing, however, relevant to the issue in this case: whether the Attorney General has the *exclusive* power to bring an action under the Cartwright Act on behalf of a county.

"[s]ue and be sued" (Gov. Code, § 23004, subd. (a)). Thus, unless specifically limited by some other legislative provision, a county enjoys the same powers as any other corporate entity in seeking damages for injuries suffered.

PG&E argues that Government Code section 23004 is inapplicable because it does not, by itself, create any cause of action. The County, however, has not initiated a complaint under Government Code section 23004; instead, it has brought a federal antitrust suit. Section 23004 merely confers on a county the capacity to bring such an action.

PG&E's amici curiae allies argue that even if Government Code section 23004 could be construed as investing the County with the *capacity* to sue for violation of federal antitrust laws, the state Cartwright Act gives the state Attorney General the exclusive *authority* to bring such actions on the County's behalf. We disagree. Although the Cartwright Act permits the Attorney General to bring an action on a county's behalf asserting violations of federal antitrust laws (see § 16750, subd. (c) [Attorney General may sue on behalf of the political subdivisions of the state for a violation of the Cartwright Act or "any comparable provision of federal law"]), it does not prohibit a county from bringing such an action.

For the reasons given above, we conclude that the state Cartwright Act does not prohibit a county from bringing an action in federal court for violations of federal antitrust law.

The judgment of the Court of Appeal is affirmed.

George, C. J., Mosk, J., Werdegar, J., Bamattre-Manoukian, J.,* and Buckley, J.,† concurred.

**BROWN, J.,** Dissenting.—Read against the background of historical practice, the language of Business and Professions Code section 16750 (section 16750) outlines a sensible scheme to rationalize the filing of antitrust proceedings on behalf of California's state government. Legally speaking, that government includes not only the state itself but its many political subdivisions—statewide agencies, counties, cities, an even greater number of school districts, and many other lesser units. The statute appears designed to implement an antitrust enforcement policy with the following features:

---

*Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

†Associate Justice, Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

First, it *re*affirms the "capacity" of the state to bring Cartwright Act antitrust claims, explicitly granting political subdivisions a cause of action. Second, it confers on the Attorney General *exclusive* authority to institute such suits. Third, it provides an exception to that authority in the limited class of cases where the effects of an antitrust defendant's conduct "occur primarily within [one] county." And last, even in *that* limited circumstance, it requires the local district attorney to obtain presuit approval and permits the Attorney General to take charge of the litigation when the public interest makes it advisable to do so.

I

The language and history of section 16750 not only belie the majority's construction, but demonstrate that in the amendments of 1961 and 1977, the Legislature was seeking to codify an orderly, rational decisional structure for filing multicounty antitrust claims on behalf of California governments. The division of authority settled on sensibly centralized decisionmaking at the highest level of public lawyering. As one court has written, reflecting on a similar context involving federal antitrust claims by a state's political subdivisions: "Justice and judicial economy is best served by having the largest governmental unit sue on behalf of all its parts rather than having multiple suits brought by various political subdivisions within the State." (*State of Illinois* v. *Associated Milk Producers, Inc.* (N.D.Ill. 1972) 351 F.Supp. 436, 440; see also *Nash Cty. Bd. of Ed.* v. *Biltmore Co.* (4th Cir. 1981) 640 F.2d 484, 496 (*Nash County*); *State of Illinois* v. *Harper & Row Publishers, Inc.* (N.D.Ill. 1969) 301 F.Supp. 484, 495 [6 A.L.R.Fed. 1].)

Relying on our opinion in *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10] (*D'Amico*), the federal Court of Appeals for the Fifth Circuit has provided a nutshell description of the powers of the nation's state attorneys general. In *State of Fla.* ex rel. *Shevin* v. *Exxon Corp.* (5th Cir. 1976) 526 F.2d 266, that court wrote "the attorneys general of our states have enjoyed a significant degree of autonomy. Their duties and powers typically are not exhaustively defined by either constitution or statute but include all those exercised at common law. There is and has been no doubt that the legislature may deprive the attorney general of specific powers; but in the absence of such legislative action, he typically may exercise all such authority as the public interest requires." (*Id.* at p. 268, fns. omitted; see also *Nash County, supra,* 640 F.2d at p. 494 ["At common law, an attorney general, in the absence of some restriction on his powers by statute or constitution, has complete authority as the representative of the State *or any of its political subdivisions* 'to recover damages . . . alleged to have been sustained . . .' even though those subdivisions may not have

'affirmatively authorized suit.' " (Italics added.)]; *In re Armored Car Anti-trust Litigation* (5th Cir. 1981) 645 F.2d 488, 492.) Given the extensive historical common law powers of the office of Attorney General in the United States and in California, we ought to begin with a presumption: *Unless the contrary appears affirmatively by statute, the Attorney General has exclusive authority to institute Cartwright Act antitrust proceedings on behalf of all government entities.*

In other words, in sorting out who within state government has authority to represent whom in judicial proceedings, the starting point is not the assumption that counties possess authority to institute Cartwright Act suits in their own right. Instead, courts should start with the inherent authority of the Attorney General to represent all state entities. The next question is whether that authority has been withdrawn or transferred elsewhere. Has the Legislature affirmatively authorized Stanislaus County to institute the anti-trust suit out of which this case arises? The majority has no difficulty arriving at the wrong answer to that question. It looks to the text of subdivision (a) of section 16750, a provision that says in substance, "Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by [the Cartwright Act] may sue . . . ." Because subdivision (b) of the statute declares the "state and any of its political subdivisions and public agencies shall be deemed *a* person within the meaning of" (italics added) section 16750, the majority concludes the County of Stanislaus is "a person" injured in its "business or property" by Pacific Gas and Electric Company's (PG&E) conduct. Therefore, it "may sue."

But the majority's syllogism is doubly flawed. First, it overlooks a settled distinction of public law. Although a public entity may have "capacity" or "standing to sue," it does not follow from that alone that the Legislature has granted it *authority* to institute litigation by counsel of its choosing. (See, e.g., *Museum Boutique Intercontinental, Ltd.* v. *Picasso* (S.D.N.Y. 1995) 886 F.Supp. 1155, 1159 [" '[C]apacity' and 'authority' are distinct concepts. *See generally* Black's Law Dictionary 803, 121 (5th Ed.1979) (defining 'capacity' as the ability of a particular . . . entity to use . . . the courts . . . and 'authority' as the permission or right to exercise power)."]; *Brown* v. *Ortho Diagnostic Systems, Inc.* (E.D.Va. 1994) 868 F.Supp. 168, 170 ["[T]he question presented here is not who can sue or be sued, but rather who can represent whom in federal court."]; 6A Wright et al., Federal Practice and Procedure (1990) § 1562, p. 454 ["A grant of capacity to a governmental corporation only means that it may sue or be sued in its own name, as opposed to that of the government . . . ."] .)

Second, subdivision (b) of section 16750 does not declare that "the state and any of its political subdivisions . . . shall be deemed [*persons*]." Its

grammar is more subtle. The statute declares that for Cartwright Act purposes, these entities "shall be deemed *a* person." (§ 16750, subd. (b), italics added.) In other words, the state, its constituent agencies, the counties, all the political entities making up California's scheme of government *together* comprise "*a*" jural person for Cartwright Act purposes. The drafter's choice of words is suggestive. It reinforces the view that what the Legislature intended when it added subdivisions (b) and (c) to section 16750 in 1961 was the creation of both a single "unitary public plaintiff" (as the Attorney General put it at oral argument) and the preservation of a kind of statutory pyramid that confers on the state's chief legal officer the exclusive authority to say "yea" or "nay" to proposed multicounty Cartwright Act litigation, from the most sprawling county to the smallest water district.

## II

The majority accepts the proposition that the county has the *capacity* to file this action. (See maj. opn., *ante*, at p. 1150.) Yet it rejects PG&E's corollary argument that section 16750 grants the county nothing *more* than a cause of action for injuries resulting from business conduct proscribed by the Cartwright Act. Read as a whole, PG&E argues, section 16750 not only does *not* authorize counties to commence such proceedings, it confers that power solely on the Attorney General. I agree.

Like many other American jurisdictions, the California Constitution recognizes the Attorney General as the government's highest legal official. (Cal. Const., art. V, § 13 ["[T]he Attorney General shall be the chief law officer of the State."].) "As such he possesses not only extensive statutory powers but also broad powers derived from the common law relative to the protection of the public interest. [Citations.] . . . '[I]n the absence of any legislative restriction, [he] has the power to file any civil action or proceeding directly involving the rights and interests of the state . . . .' [Citation.]" (*D'Amico, supra,* 11 Cal.3d at pp. 14-15, italics added.) In deciding who is entitled to bring suit on behalf of the state and its subdivisions, courts thus *start* with the presumption that the government officer authorized to represent the state and subordinate elements of government is the Attorney General. They then look for some affirmative indication that the Legislature has made a contrary designation.

At the federal level, the conclusion we reached in *D'Amico, supra,* 11 Cal.3d 1, is imposed by statute, reflecting a kind of nationwide template that has been around since the formative years of the republic. Section 516 of title 28 of the United States Code provides: "Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is

reserved to officers of the Department of Justice, under the direction of the Attorney General." The federal Court of Appeals for the Fifth Circuit has said of section 516 that it means "when an agency is given *specific authorization* to proceed without the assistance or supervision of the Attorney General it may do so." (*I.C.C.* v. *Southern Ry. Co.* (5th Cir. 1976) 543 F.2d 534, 538, italics added.) Absent specific authorization, and given the Attorney General's "plenary power and supervision over all government litigation," federal agencies *lack* the authority to proceed *without* Department of Justice approval and representation. (*Id.* at p. 535.) This principle of representational authority, the Fifth Circuit went on to say, "not only centralizes responsibility for the conduct of public litigation but enables the President, through the Attorney General, to supervise the various policies of the executive branch." (*Id.* at p. 536; see also *The Confiscation Cases* (1868) 74 U.S. (7 Wall.) 454, 458 [19 L.Ed. 196].)

Yet according to the majority's logic, not just the Attorney General is authorized to file multicounty Cartwright Act suits. *All* of the state's 58 counties, *all* of its 470-plus cities, *all* of the 4,500 school districts, and *all* of the many less-well-known agencies and subunits of the state's political organization are authorized by section 16750, subdivision (b) to file such suits as well. Finally, California's 58 district attorneys, whose authority, as the majority acknowledges, is limited by statute to cases in which the asserted antitrust injury is "local," must also be counted among those who may institute suit. Conflating "capacity" and "authority," and reading subdivisions (a) and (b) as if the rest of section 16750 did not exist, the majority concludes the amendments of 1961 and 1977 were not intended to rationalize enforcement of multicounty antitrust claims on behalf of government entities by concentrating them in a central authority. They were meant, the majority concludes, to achieve the *opposite* result: enlarging the class of government entities authorized to file multicounty antitrust suits.

### III

We do not need unpronounceable Latin phrases ("*expressio unius est exclusio alterius*"), string citations, or Sutherland on Statutory Construction to know a statute made up of parts ought to be read as a whole, integrating its subdivisions so that each has meaning, the statute in its entirety makes sense and is faithful to the apparent legislative purpose. The majority nevertheless insists on reading subdivisions (a) and (b) of section 16750 as "stand alone" provisions unrelated to the rest of the statute. The result is what often happens when parts of a statute are read in isolation—some are robbed of all meaning, while the content of others is distorted.

Originally enacted in 1907, section 16750 of the Cartwright Act underwent a major legislative overhaul in 1961. (Stats. 1961, ch. 1023, § 1, pp.

2705-2706.) In that year, the Legislature added what is now subdivision (b), providing that the state and its political subdivisions are "*a person*" within the meaning of subdivision (a), the provision that confers a cause of action for damages on those injured by certain kinds of proscribed business conduct. (Stats. 1961, ch. 1023, § 1, p. 2706, italics added.) As the Legislature described subdivision (b) at the time it was enacted, it was "added to . . . section [16750] for the purpose of clarification only and is not to be construed or interpreted as an indication that the State or any of its political subdivisions or public agencies is not a person within the meaning of Section 16750 as originally enacted . . . . The Legislature hereby further declares that at the time of the original enactment of Section 16750, and at all times since, it intended that the State, its political subdivisions and public agencies be included within the meaning of the word 'person.'" (Stats. 1961, ch. 1023, § 2, p. 2706.)

Also in 1961, the Legislature amended another Cartwright Act statute, section 16754, to authorize county district attorneys to file civil or criminal antitrust proceedings alleging violations "on the order of the Attorney General." (Stats. 1961, ch. 757, § 1, p. 2013.) In 1977, however, after the Attorney General had expressed concern that the decentralization of authority to file such proceedings effected by the 1961 amendment would hobble his office's control over antitrust litigation on behalf of the government, the Legislature again amended section 16750. The compromise it settled on is reflected in subdivision (g) as it reads today. That provision limits the authority of county district attorneys to file Cartwright Act proceedings to cases in which "it appears that the activities giving rise to [the proceeding] or the effects of such activities *occur primarily within such county*." (§ 16750, subd. (g), added by Stats. 1977, ch. 540, § 1, p. 1743, italics added.)

What could have been the Legislature's motive in enacting subdivision (g) of section 16750 if, as the majority concludes, counties and other subdivisions *already had* the authority to file Cartwright Act proceedings? We can hardly suppose the Legislature labored over this dense, reticulated scheme to add yet *another* layer to the host of government lawyers who, under the majority's reading, were already authorized to file Cartwright Act suits. On the other hand, if as I believe, only the Attorney General was (and is) authorized to institute such proceedings, the addition of subdivision (g) is eminently sensible. Leaving intact the Attorney General's central command over multicounty Cartwright Act government claims litigation, the 1977 amendment sensibly parceled out to county district attorneys the authority to institute suit where the effects of the proscribed business conduct are *local*. (§ 16750, subd. (g).) And as a check on the possibility of litigative improvidence, subdivision (g) requires district attorneys contemplating such suits to

file with the Attorney General an advance copy of the proposed complaint "together with a confidential memorandum and report explaining the facts giving rise to the proposed prosecution and supporting the filing of the new complaint." (*Ibid.*) Finally, the 1977 amendment provides that if the Attorney General deems it "in the public interest," he "may take full charge of any such investigation or prosecution . . . ." (*Ibid.*)

I am at a loss to imagine what these restraints were intended to accomplish if they do not manifest a legislative intention to insure a continuation of central control over the filing of multicounty Cartwright Act and related antitrust proceedings. Of a similar scheme enacted by another state Legislature, the federal Fourth Circuit Court of Appeals has written: "[C]ommon sense dictates that when an alleged wrong affects governmental units on a state-wide basis, the state should seek redress on their behalf as well as on its own rather than parcelling out the actions among local agencies. However, to ease the administrative burden on the Attorney General's office, when a single local [government entity] is wronged, that unit should individually pursue the remedy . . . . This is the scheme, we believe, that the North Carolina Legislature had in mind when it adopted [the statute at issue]." (*Nash County*, *supra*, 640 F.2d at p. 496, fn. omitted.) That, I suggest, is this case.

## CONCLUSION

We ought to give more thought to the potential impact of today's ruling —on California as an organized scheme of government, on the state's relation to its constituent political departments, on those who pay taxes and do business here. The result reached by the majority is a crazy quilt of overlapping, conflicting authority to file multicounty antitrust litigation willy-nilly, one likely to generate needless intergovernmental conflict and conclude prematurely some public antitrust claims on res judicata grounds. It amounts to a judge-drawn scheme especially inadvisable in antitrust litigation. In the entire domain of public regulatory law, the field of antitrust, with its "rule of reason" standards, sophisticated economic analysis, and often fine line between restraining predatory practices and stifling beneficial economic competition, seems the *least* likely candidate for the fractured and diffused litigative authority upheld by the majority.

Antitrust litigation brought by the Attorney General is more likely to be taken seriously by a targeted defendant. Not only does that office have greater investigative resources, expertise and staying power, but the fact that the state's highest legal office has placed its imprimatur on the pleadings— implicitly representing the complaint as reflecting that office's considered views of the public interest—adds heft to allegations of antitrust misconduct.

These observations, of course, have lost their force now that the majority's view has become the law of California. In their place, we are apt to be treated to a horse race of multicounty Cartwright Act suits brought by any number of political subdivisions, a spectacle that will not only undermine the weight accorded centrally vetted antitrust filings, but one likely to generate confusion in several areas—issue preclusion, collateral estoppel, and the practicability of effective settlements among them.

Nor should we lose sight of the fact that the check on the filing of ill-conceived antitrust litigation that follows from the Attorney General's centralized control over the decision to initiate suit strengthens the government's hand by promoting a thorough presuit scrutiny. The unspoken proposition underlying the majority's conclusion seems to be that the economic interests of the counties have a dignity equal to that of the state. If so, the argument might run, counties must have an equal right to decide for themselves whether to file Cartwright Act proceedings. Suppose the Attorney General declines to institute suit to challenge business practices that two or more counties believe harm their economic interests. What then? Are these units of government to be left without an antitrust remedy?

The answer may sometimes be "yes." But that is not quite the catastrophe the majority evidently apprehends. "Counties under the scheme of California government are 'mere subdivisions of the State.' (Cal. Const., art XI, § 1.)" (*Byers* v. *Board of Supervisors* (1968) 262 Cal.App.2d 148, 155 [68 Cal.Rptr. 549]; see also *Hicks* v. *Board of Supervisors* (1977) 69 Cal.App.3d 228, 242 [138 Cal.Rptr. 101].) Joined to that contingent legal status is the practical reality: If government is to protect the economic security of its constituent parts *and* act with the deliberative fairness California's citizens are entitled to expect, someone must be in charge. The alternative fractures the unitary system of government contemplated by our Constitution and, to borrow a still powerful metaphor from the ancient world, drives a wedge between the state's head and its constituent body. (Plato, The Republic.) Because, unlike the majority, I do not believe the counties' capacity to sue must inevitably trump the broader community interest in cooperation, I dissent.