Filed 6/10/14  In re J.M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D065252 |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14788C) |
| v. | |
| M.P., | |
| Defendant and Appellant; | |
| J.M., | |
| Appellant. | |

APPEALS from findings and orders of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed; stay vacated.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant M.P.

Patricia K. Saucier, under appointment by the Court of Appeal, for Appellant J.M., a Minor.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

The minor, J.M., contends the juvenile court erred when it found that J.M. had a probability for adoption but was difficult to place, and continued his permanency plan selection and implementation hearing for 180 days pursuant to Welfare and Institutions Code section 366.26, subdivision (c)(3).[1] J.M.'s mother, M.P., contends the juvenile court erred when it identified a permanent plan of adoption for J.M. and found that the beneficial parent/child relationship and sibling relationship exceptions to termination of parental rights did not apply. (§ 366.26, subd. (c)(1)(B).) Affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

M.P. is the mother of three children: two-year-old J.M.,[2] five-year-old J.P., and seven-year-old J.A. The children have different fathers. In March 2013, J.M.'s father, Benjamin M.,[3] was arrested on 21 counts of willful cruelty to a child and one count of torture for severely physically abusing J.P. He was later sentenced to nine years in prison. (Pen. Code, §§ 273a, subd. (a), 206.) M.P. was aware that Benjamin was

---

[1]    All further statutory references are to the Welfare and Institutions Code.

[2]    This appeal concerns findings and orders in J.M.'s case only.

[3]    Benjamin is not a party in this proceeding.

2

mistreating her children. She pleaded guilty to one count of willful cruelty to a child and was released from jail on probation after serving five months of a one-year sentence. The details of M.P.'s complicity in Benjamin's horrific abuse of J.P., and his maltreatment of J.M. and J.A., are extensively detailed in this court's nonpublished opinion, *In re J.M.* (May 9, 2014, D065121), and we need not repeat those details here.

At the disposition hearing, the juvenile court denied reunification services to M.P. and Benjamin, and referred J.M.'s case to a section 366.26 hearing. The court ordered reunification services for J.P.'s father[4] and J.A.'s father[5].

J.M. and J.A. were placed together in foster care. J.P. remained in the hospital for a month while she recovered from a pancreatic injury, malnourishment, and at least 38 fractures, including a fractured hip. When released, J.P. was placed in a separate foster home. She told her foster mother, "My daddy spanked me with hangers. They really make you bleed."

J.M.'s behavior was difficult. At 20 months, he was not talking or pointing to express his wishes. He would become "stiff, rigid and angry" for no apparent reason and had tantrums approximately four times a day. It was difficult to discipline J.M. He liked to bite and pinch. J.M. would kick the dog and hit other children. If restrained from

---

4    Although he had made regular child support payments, J.P.'s father, Alejandro G., had not maintained a relationship with J.P. When he learned of J.P.'s circumstances, he expressed interest in reunifying with her.

5    M.P. was married to J.A.'s father, Alberto A., who was entitled to reunification services as a presumed father. (See § 361.5, subd. (a).) The San Diego County Health and Human Services Agency (Agency) was initially unable to locate Alberto but later submitted an updated case plan for J.A. that included services for Alberto.

biting others, he bit himself. He also pulled his own hair, scratched himself, and banged his head against the floor.

J.M. was diagnosed with adjustment disorder secondary to past trauma and disruption in attachment with primary caregivers, and separation from sibling. The evaluating psychologist recommended that J.M. receive treatment for posttraumatic stress disorder (PTSD).

In August 2013, M.P. was released from jail to a residential treatment center. In September, she saw J.M. for the first time since March. Visitation was supervised by the social worker, who reported that J.M. cried when separated from his caregiver. However, he let M.P. hug him and quieted when she sang to him. J.M. rarely made eye contact with M.P. When she tried to engage him, he "would just be floppy." J.M. was unusually quiet and withdrawn for several hours after the visit.

A week later, M.P. met J.M. and his caregiver at the gate of her treatment facility. When J.M. saw M.P., he began to walk backwards. He approached his caregiver and began to cry when she picked him up. The caregiver encouraged J.M. to go to M.P. M.P. put J.M.'s head against her shoulder and comforted him. J.M. remained limp and lethargic for most of the visit. When the visit ended, J.M. ran to his caregiver with outstretched arms.

At the next visit, J.M. cried when the caregiver handed him to M.P. M.P. was able to comfort him. J.M. let M.P. take his picture and played with blocks while sitting next to M.P. At the end of the visit, J.M. jumped into M.P.'s arms with a smile. He greeted his caregiver with a big smile and easily went to her when the visit ended.

4

In November, M.P. filed a section 388 petition asking the juvenile court to either order a period of reunification services or return J.M. to her custody. M.P. was actively participating in treatment and was taking medication to improve her mental health condition. She was very remorseful for her role in Benjamin's abuse and mistreatment of her children.

The juvenile court summarily denied M.P.'s section 388 petition. This court affirmed the juvenile court's ruling. (*In re J.M., supra,* D065121.)

The section 366.26 hearing was held on December 11, 2013. The juvenile court admitted the Agency's reports and a letter from M.P.'s treating physician in evidence, and accepted M.P.'s stipulated testimony. M.P. stated, "My daughter refuses to see me because of the damage I've caused her. My son J.A. is not sure about me. He has fears, fears of me coming along with Benjamin and the abuse starting all over again. J.M. is growing to know me all over again. J.M.'s speech is delayed, and he is either happy or mad. There is no in between. My children are suffering for my actions, failure to protect, and to stand up for them. . . . [¶] . . . [¶] I understand that the outcome of today's court is not going to be what's best for me, but what's best for my children." M.P. said she was "a loving and growing mother who has made a great mistake" but also wanted what was best for the children. She was recently diagnosed with bipolar disorder, panic disorder, PTSD and polysubstance dependence. Her physician estimated it would take from three to six months to achieve a clinically significant response through medication and psychotherapy.

The social worker recommended a plan of adoption for J.M. J.M.'s current caregiver was not interested in adoption but was willing to care for J.M. and J.A. until a permanent home was identified. J.M. had received weekly behavior therapy since August. He still had difficulty regulating his behaviors. Once he had a tantrum, he would continue in that mode for the rest of the day. He did not follow simple directions. At times, J.M. did not appear to understand what was said to him. During an evaluation, he was somber in demeanor and did not smile. J.M. was self-injurious and aggressive toward other people and animals.

While recognizing that J.M. needed developmental and behavioral services, the social worker assessed J.M. as adoptable. He was not yet two years old and in good health. The social worker reported there were "75 possible San Diego County Adoptions families approved to adopt a child matching J.M.'s characteristics." A friend of M.P.'s was considering adopting J.M. and possibly his siblings. The friend's brother was "open to assessment for placement of the children" but did not explicitly express an interest in adoption. The Agency initiated background checks on both individuals.

The social worker observed three visits between M.P. and J.M. The social worker said J.M. viewed M.P. as a friendly visitor. He seemed to remember her but appeared confused in her presence. J.M. was becoming more comfortable with M.P. He cried when separated from his caregiver but M.P. was able to comfort him. She did a good job trying to engage him and meet his needs. J.M. seemed relieved when his caregiver returned. He ran to her when the visits ended.

The social worker said J.M., J.P. and J.A. were a bonded sibling set. Placement options were not resolved. J.P. and J.A. were closer to each other than either of them was to J.M. It was possible that J.P. and J.A. would be placed with J.P.'s father. If J.A. was not placed with J.P., the Agency would make every effort to place J.A. and J.M. together in an adoptive home. If J.P. was not reunited with her father, the Agency would try to find an adoptive home for all three siblings. However, the social worker believed that J.M. would benefit more from the permanency and stability of adoption than he would from maintaining his sibling relationships.

The juvenile court found that J.M. had a high probability of adoption but was difficult to place. His behaviors were difficult, with an element of aggression, and the Agency had not yet narrowed its search or identified any qualified adoptive family. No preplacement visits had occurred, which were critical in assessing whether the family was a good match for J.M. In addition, the sibling issue was very complex and "completely fluid." The juvenile court commended M.P. for her recent efforts to address her underlying issues but determined that any benefit J.M. received from his relationship with M.P. was outweighed by his need for stability. In addition, because of J.M.'s age and his significant behavioral and developmental issues, the juvenile court found that J.M.'s long-term emotional interests would be better served by adoption than by maintaining his relationships with his siblings. The juvenile court identified adoption as the permanency plan goal for J.M. and set a section 366.26 hearing in 180 days. (§ 366.26, subd. (c)(3).)

7

DISCUSSION

A

*The Parties' Contentions*

J.M. contends the juvenile court's finding that he was difficult to place was not supported by substantial evidence and the error was prejudicial to his interests because it delayed implementation of his permanency plan.  He asserts the juvenile court should have found that he was likely to be adopted and terminated parental rights.

M.P. argues there is no substantial evidence to support the selection of adoption as J.M.'s permanency plan.  She contends J.M. is not adoptable due to his cognitive, emotional, behavioral and diagnosed mental health issues.  M.P. further contends the juvenile court erred in finding that the beneficial parent/child relationship and the sibling bond exceptions to termination of parental rights did not apply.

The Agency asserts the juvenile court erred in proceeding under section 366.26, subdivision (c)(3) because the social worker did not ask for additional time to locate an adoptive home for J.M. and the evidence clearly showed that he was likely to be adopted within a reasonable time if parental rights were terminated.

B

*Statement of Law and Standard of Review*

At a permanency plan selection and implementation hearing, the juvenile court is required to review the social worker's assessment report, receive other evidence the

8

parties may present, and make findings and orders in the following order of preference:[6]

(1) terminate the rights of the parents and order that the child be placed for adoption; (2) appoint a relative as legal guardian for the child; (3) on making findings under section 366.26, subdivision (c)(3), identify adoption as the permanent placement goal and order that efforts be made to locate an appropriate adoptive family for the child; (4) appoint a nonrelative legal guardian for the child; or (5) order a plan of long-term foster care. (§ 366.26, subd. (b).)

If the juvenile court finds that termination of parental rights would not be detrimental to the child and that the child has a probability for adoption but is difficult to place and there is no identified or available prospective adoptive parent, the court may identify adoption as the permanent placement goal and, without terminating parental rights, order that efforts be made to locate an appropriate adoptive family for the child within a period not to exceed 180 days.  (§ 366.26, subd. (c)(3).)  A child may only be found to be difficult to place for adoption if there is no identified or available prospective adoption parent for the child because of the child's membership in a sibling group, or the presence of a diagnosed medical, physical, or mental handicap, or the child is seven years of age or older.  (§ 366.26, subd. (c)(3).)

---

[6]     Because the provisions of the Indian Child Welfare Act, title 25 United States Code section 1901 et seq. and related state provisions under Welfare and Institutions Code section 224 et seq. do not apply here, we do not recite the placement preferences for an Indian child.

We review the juvenile court's factual findings under section 366.26, subdivision (c)(3) under the substantial evidence standard of review. (*In re Gabriel G.* (2005) 134 Cal.App.4th 1428, 1438; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)

C

Appellants have not shown that the juvenile court abused its discretion when it determined that J.M. was difficult to place within the meaning of section 366.26, subdivision (c)(3). There is substantial evidence to support the finding that J.M. was difficult to place. He was a member of a sibling group and was diagnosed with adjustment disorder secondary to past trauma, which manifested in self-injury and aggressive behaviors against people and animals. In addition, as we will discuss, there is substantial evidence to support the findings there were no circumstances that would make terminating parental rights detrimental to J.M. (See Discussion, pt. D, *post*.)

We reject M.P.'s argument that the juvenile court erred in identifying adoption as the permanent plan goal because J.M. was not adoptable. A finding of adoptability, by clear and convincing evidence, is not a prerequisite for proceeding under section 366.26, subdivision (c)(3). Instead, the court is required to find, by a preponderance of the evidence, that the child has a probability for adoption but is difficult to place. Thus, an argument whether the child is adoptable is not ripe for review on an appeal from findings and orders under subdivision (c)(3). At the next section 366.26 hearing, the juvenile court will determine, based on review of the Agency's new assessment report and other relevant evidence, whether J.M. is likely to be adopted within a reasonable time if parental rights are terminated. (§ 366.26, subd. (c)(1).)

We are not persuaded by the Agency's argument that the juvenile court erred when it proceeded under section 366.26, subdivision (c)(3) because the evidence showed that J.M. was adoptable. When making decisions regarding the child, the juvenile court exercises its special responsibility to the child as *parens patriae*[7] and looks to the totality of the child's circumstances. (*In re Chantal S*. (1996) 13 Cal.4th 196, 201; *In re J.F.* (2011) 196 Cal.App.4th 321, 335.) The juvenile court reasonably concluded that in view of J.M.'s diagnosis and difficult behaviors, his membership in a sibling group, and the lack of any identified or available prospective adoptive parent, it was in J.M.'s best interests to identify adoption as his permanent plan goal and direct the Agency to locate an appropriate adoptive family for him. A finding of adoptability requires "*clear and convincing* evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S.* (2003) 31 Cal.4th 396, 406, italics added.) Although the social worker believed that J.M.'s behavioral problems did not impede his adoptability, the juvenile court assessed J.M.'s diagnosis and behaviors, which were uncommon in a child under the age of two years, as significantly more serious. This is the province of the juvenile court as the trier of fact. (*In re Zeth S.,* at p. 410.) A social worker's opinion that a child is adoptable does not prevent the juvenile court from reaching a different conclusion after considering all the evidence presented and the totality of the child's circumstances. (See *In re Chantal S*., at p. 201.)

---

7　　" ' " '*Parens patriae*,' literally 'parent of the country,' refers traditionally to [the] role of [the] state as sovereign and guardian of persons under legal disability . . . ." ' " (*Clayworth v. Pfizer, Inc*. (2010) 49 Cal.4th 758, 776, fn. 14, italics added, quoting *Pacific Gas & Electric Co. v. County of Stanislaus* (1997) 16 Cal.4th 1143, 1148, fn. 6.)

Here, the juvenile court believed that preplacement visits would be necessary to ensure that the prospective adoptive family would be able to meet J.M.'s needs. J.M.'s behaviors had not been amenable to intervention and there were no reports of improvement by the time of the section 366.26 hearing. He was not using words to communicate. J.M. picked his nails and ears, bit himself and pulled his own hair. He kicked the family dog. J.M. was especially aggressive toward other children. In addition to his diagnosis of adjustment disorder, J.M. had borderline clinical elevations for affective problems and pervasive developmental problems. At times, J.M. did not seem to understand what was being said to him. The social worker referred J.M. to therapy as an intervention for PTSD, but that therapy had not yet started. Despite having had more than five months to locate an adoptive family for J.M., the social worker had not identified any prospective adoptive parent for him and had not completed a criminal background check on a family friend who expressed interest in adoption. The juvenile court acted within its discretion when it concluded J.M. had a probability for adoption but was difficult to place and his best interests would be served by proceeding under section 366.26, subdivision (c)(3).

At all proceedings under section 366.26, the juvenile court is required to act in the best interests of the child. (§ 366.26, subd. (h)(1).) Here, in view of J.M.'s mental health diagnosis and membership in a sibling group, the juvenile court decided that the best course of action for J.M. was to identify adoption as the permanent placement goal and direct the Agency to locate an appropriate adoptive home for him. Even where there is substantial evidence to support an adoptability finding, as here, we will not substitute our

own judgment as to what is in the child's best interests for the juvenile court's determination in that regard. (*In re Zeth S.*, *supra*, 31 Cal.4th at p. 410.)

D

*There Is Substantial Evidence to Support the Finding That Terminating Parental Rights Would Not Be Detrimental to J.M.*

M.P. contends the juvenile court erred when it proceeded under section 366.26, subdivision (c)(3) because the beneficial parent/child relationship and the sibling bond exceptions applied. She argues the juvenile court's findings are not supported by substantial evidence. We disagree.

If the court finds there is a compelling reason for determining that termination would be detrimental to the child due to one or more statutorily-defined circumstances, the court may not terminate parental rights or identify adoption as the child's permanent plan goal under section 366.26, subdivision (c)(3). (§ 366.26, subd. (c)(1)(B)(i)-(vi).) Instead, at that hearing, it must select a permanent plan of either guardianship or long-term foster care. (§ 366.26, subd. (b)(3), (5), (6).)

On review, we must affirm the juvenile court's rejection of any exception to termination of parental rights if the court's findings are supported by substantial evidence. (*Autumn H., supra,* 27 Cal.App.4th at p. 576.) We do not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

13

1. *Beneficial Parent/Child Relationship Exception*

Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." " 'Benefit from continuing the . . . relationship' " means the parent/child relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) Where the parent has continued to regularly visit and contact the child, and the child has maintained or developed a significant, positive, emotional attachment to the parent, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

M.P. does not meet her burden on appeal to show there is no substantial evidence to support the juvenile court's finding that the beneficial parent/child relationship did not apply. J.M. was traumatized while in M.P.'s care. M.P. had minimal contact, if any, with J.M. from his removal from her care in March 2013 until visits started in September 2013. J.M. did not see his mother from age 15 to 21 months. This is a significant length of time for a child of that age, and resulted in a breakdown of the parent/child relationship. M.P. acknowledged that J.M. was just getting to know her again. At visits,

14

although M.P. was present, he cried when he was separated from his caregiver. At one visit, he began to walk backwards when he saw M.P. and went to his caregiver to be picked up. He then began to cry. When the visit ended, he ran to his caregiver with outstretched arms. Although J.M. appeared to be more comfortable with M.P. at the third visit, he separated easily from her. The social worker, who observed the visits, believed that J.M. viewed M.P. as a friendly visitor. There is no evidence to show that J.M. had a substantial, positive emotional attachment to M.P.

There is substantial evidence to support a finding that J.M. would not be harmed by terminating parental rights. (§ 366.26, subd. (c)(1)(B).) The record permits the reasonable inference that any benefit J.M. would derive from reestablishing a relationship with his mother would be greatly outweighed by the benefit he would receive in a permanent home with capable and committed adoptive parents. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

2. *Sibling Bond Exception*

The sibling bond exception applies when the juvenile court finds that termination of parental rights would be detrimental to the child because it would substantially interfere with the child's sibling relationships, taking into consideration the nature and extent of those relationships. (§ 366.26, subd. (c)(1)(B)(v).) Factors indicative of the nature and extent of the sibling relationships include, but are not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences *or* has existing close and strong bonds with a sibling, and whether

15

ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption.  (*Ibid*.)

M.P. argues J.M. was part of a bonded sibling set.  He lived with J.A. all his life and retained strong bonds with J.P. through regular visitation.  In support of her contention, M.P. relies on studies finding that when dependent children are separated from their siblings, their anxiety and pain from removal from their parents is compounded, and siblings help each other adapt to new and frightening situations by providing emotional support, comfort and a sense of stability, belonging and continuity. (Kernan, *Keeping Siblings Together, Past Present and Future* (2005) vol. XXVI, No. 4, Youth Law News, Journal of the National Center for Youth Law.)  M.P. contends the juvenile court abused its discretion when it determined that J.M.'s long-term emotional interests would be better served by adoption instead of maintaining his relationships with his siblings.

While the record shows that it is important for J.M. to maintain his sibling relationships, it also clearly shows that long-term emotional needs are better served by having a loving, committed parent who can provide a safe and stable home to him. Siblings, with few exceptions, cannot provide the kind of nurturing, responsible care that a young child needs to have in order to thrive and become fully functioning adults.  In J.M.'s case, because of his emotional, developmental and behavioral disorders, his need for a competent, caring and stable parent is paramount.  (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 950 [the application of

16

the sibling bond exception will be rare, particularly when the proceedings concern young children].)

M.P. argues preservation of J.M.'s relationships with his siblings can only be achieved by a permanent plan other than adoption.  This argument is purely speculative.  There is nothing in the record to indicate that a permanent plan of guardianship or long-term foster care would result in placing the siblings in the same home or promote J.M.'s relationships with his siblings more than a plan of adoption.  Thus, the selection of a lesser-preferred permanency plan would not further J.M.'s interest in maintaining his relationships with his siblings or provide him with the security and sense of belonging conferred by adoption.  (*In re Valerie A.*, *supra,* 152 Cal.App.4th at p. 1014.)  The juvenile court did not err when it determined that termination of parental rights would not be seriously detrimental to J.M. under the sibling bond exception.  (§ 366.26, subd. (c)(1)(B)(v).)

## DISPOSITION

The findings and orders are affirmed.  The stay issued May 1, 2014, is vacated.


HUFFMAN, Acting P. J.

WE CONCUR:


McDONALD, J.


IRION, J.

17